## JAMES DAWSON v. THE STATE.

### *No. 372.   Decided February 7.*

1. **Burglary—Continuance—New Trial—Newly Discovered Testimony.**—On a trial for burglary, where it appeared that the main inculpatory evidence was that of a witness whose connection with the stolen property tended strongly to implicate him as an accomplice, *held*, that the court should have granted the continuance, or at least the new trial, for the newly discovered evidence by which it was proposed to establish the complicity of said witness in fact as an accomplice to the burglary.

2. **Evidence — Freight Waybills, Secondary Evidence of Contents of.**—On a trial for burglary from freight cars of a railway, waybills which are made out and sent by the clerks in their special departments and line of duty, which accompanied the cars, are admissible as original evidence tending to prove that the articles therein mentioned were shipped in said car.   And it is not necessary to produce the clerk, nor the persons who packed the articles in the box, or loaded the packages on the cars, to testify to those facts.   And where such waybills are shown to be beyond the jurisdiction of the court, parol evidence of their contents is admissible.

3. **Same — Clerical Entries. —** Entries made by the clerks at the time of examining the contents of the cars to determine if any of the packages were missing, are admissible as original testimony.

**4. Evidence — Systematic Crime.** — On a trial for burglary, it was not error to admit proof of burglaries committed prior and subsequent to the one involved in the trial, nor the character and kind of articles taken from the cars, most of which were found concealed upon the premises of the accused; since such testimony tended to establish a regular system of crime, organized and carried on by a band of criminals, of which the accused was one.

**5. Same — Independent and Separate Crimes — Charge of the Court.**—Independent, separate, cognate crimes are properly admissible in evidence to show motive, intent, etc.; but when introduced for such purpose, and not for the purpose of showing systematic crime, the charge of the court should limit the consideration of the testimony to the purpose for which it was admitted.

APPEAL from the District Court of Lamar.    Tried below before Hon. E. D. McCLELLAN.

Appellant was indicted for burglary of a railway car, occupied and controlled by one Charles Griffith, with intent to commit theft therefrom of property belonging to said Griffith, and at his trial was convicted, his punishment being assessed at two years imprisonment in the State penitentiary.

When this case was called for trial, the appellant presented his application for a second continuance, in writing, duly sworn to, on account of surprise at the contract made with the State by John Dawson, whereby the said John Dawson was to testify for the State, and on account of the absence of the witness Peter Daniels.

The defendant in his application stated, that this case was set down for trial on the 23rd day of October, 1893, and was called for trial on Tuesday, the 24th day of October, and the State, through her attorney, announced not ready on account of the absence of certain witnesses, to-wit, Hunter and Stallings. Appellant protested against a postponement, but the court, over his protest, set the case over for the 30th day of October. At this time John Dawson, who was indicted by separate bill filed in this court, with the same offenses as are charged against defendant, was in court, demanding a trial. That since said postponement, and on the 30th day of October, the State and John Dawson had made a contract, whereby John Dawson agreed to testify against defendant, and the State agreed to dismiss all the cases against him; that said John Dawson proposed to swear that certain goods found in his possession were purchased by him from defendant, and that he had heard an agreement made between defendant and other parties that such parties should rob railroad cars and houses, bring the goods to defendant, and he would buy them at half-price. That he could prove by the absent witness that he had purchased similar goods from the proposed witness, John Dawson, prior to his arrest, and that said John Dawson told him that he had bought them from a pedler; that the goods he bought from John Dawson were similar to the goods claimed to have been taken from the railway car.

Defendant in his application further stated, that he was fully ready for trial till this contract was made by the State with John Dawson, and as soon as he learned of the making of the contract he had a subpœna issued for said witness Peter Daniels, and placed the same in the hands of the sheriff, returnable instanter, but the same had not yet been returned.

Defendant further stated, that he was surprised at the contract made with John Dawson, and by what said Dawson proposed to swear; that such statements of said Dawson were false, and he could prove the same false, if he be given time to procure witnesses; that he had not had such witnesses subpœnaed for the reason that he did not anticipate that said John Dawson would be a witness for the State, and did not presume that he would, if a witness, testify falsely. Defendant stated that he would be able to procure the attendance of witnesses at the next term of court to disprove the evidence of said John Dawson.

After the trial and conviction of defendant, he moved for new trial, and assigned as one of the reasons error in overruling defendant's application for a continuance.

Defendant also prayed for a new trial on the ground of newly discovered testimony, to-wit, the testimony of Harriet Terrell, Mattie Walker, Pinkey Johnson, and James Snider. In support of this ground of his motion, defendant filed his affidavit, stating, that he did not know that the witness John Dawson would be a witness against him until a few hours before he went to trial, and did not know he would deny having poultry food, cards, soap, and other articles in his store; that as soon as John Dawson testified, he informed his attorneys that he could disprove his testimony by the above named witnesses. Attached to said affidavit of defendant is the affidavit of his attorneys, showing they had no knowledge of the testimony of said witnesses; and also the affidavits of the witnesses Harriet Terrell, James Snider, Mattie Walker, and Pinkey Johnson. The witnesses all swear to facts which contradict the witness John Dawson in material points, and show that the articles, or a great many of them, which were missed from the railway cars, were in the possession of John Dawson. The witness Pinkey Johnson swears that the basket of cards was brought to defendant's house, at which John Dawson also lived, by Lee Stevenson and John Dawson himself.

Charles Griffith, for the State, testified: I am station agent for the St. Louis & San Francisco Railway and the Gulf, Colorado & Santa Fe Railroad, at Paris, Texas. I was such agent during the months of December, 1892, and January, February, and March, 1893. All of the cars of said two railroads are in my charge, and were in my charge and possession during the months named, as such agent. I had full control of all the cars while here. The waybills of the cars, showing what they contain, are made out at the place where the cars are loaded, and forwarded to the place of destination by train. This waybill is sent us for all the

cars going out of Paris, and for cars that are destined for this place, and contains a list of the goods in the car; that is, it contains a list of packages, but does not contain an invoice of the goods in the packages. When we want to see if there is anything short in a car, we check the car by the waybill made out at the place where the car is forwarded. This waybill is made out by the forwarding agent. We have none of the original waybills now in the office at Paris; the originals are in the auditor's office. This book I have in my hand is an impress copy of the original waybills received at the Paris office during the months of December, January, February, and March last. All waybills coming to the Paris office are copied by my clerks. I copied none of them myself, nor was I present when they were copied. These books are correctly kept.

On or about the 6th day of March, 1893, there was a car broken open in Lamar County, Texas; it was a Frisco car, number 4002. The waybill for this car was dated March 6, 1893. It was a car load of merchandise, and destined to various points. It was from St. Louis, Missouri. I can not tell what was in the car except by reference to the impress copy of the waybills made in this book by my clerks. This copy was not made out by me, but was made by George Daniels. The original waybill is now in the auditor's office of the Frisco Railway, in St. Louis. I only know what the shortage is by referring to this book. I did not examine the car myself. There were many cars broken at the Union Depot in Paris, Texas, between December, 1892, and March, 1893. I do not know of my own knowledge of but one car being broken there; that was car number 4264, Frisco, containing merchandise. That car was broken on the night of March 9 or 10, 1893. I do not know what all it contained, but I know that it contained clothing. There was a box of clothing in that car that was bursted, but I do not know how much of the clothing was gone. I saw the clothing in the car; it was out of the box and was scattered around in the bottom of the car. We had no invoice of the clothing and could not tell how much of it was gone. I don't know that any of the clothing was gone.

I remember the night Lee Stevenson was killed by Mr. Nelson, at the Frisco Railway yard. The next morning after he was killed, I went with the sheriff and city marshal and others to the store and dwelling house of this defendant. The sheriff had a search warrant, and we searched the defendant's houses. About twenty feet from his dwelling house is a lot of frame store houses; two or three, I guess. We found in defendant's dwelling house a lawn mower, a lot of clothing in a trunk, a lot of tobacco, some of which was under his house and some of it in the bottom of his well; a basket of playing cards, a box of poultry food, some shoes, and I hardly know what all we did find there. Yes, we did find some spool thread there at defendant's house. I suppose that we found about a half-barrel of spool thread. We found some soap, a lot of shirts, and

some shoes.   We also found  two trunks there.   The  playing cards were in a barrel of  water, out  by the side of  defendant's dwelling.   Some of the clothing looked  like it had been worn.

Cross-examined:   I don't know of  my own knowledge that any of the goods found  at defendant's house were  goods taken from  cars at the Frisco depot.   I heard  some one ask  defendant that morning where he got that thread, and defendant said  that his wife  bought it from a peddler.   Yes, I also heard  some one ask defendant that  morning where the key to a trunk that they found there was, and defendant said that he did not know.

I was agent during December, 1892, and  January, February, and March, 1893.   I had the  exclusive control, care, and  management of those cars that came  into the  Paris yards during the  named months, as long as they were in the yards.   It was nearly an every night occurrence for cars to be broken.   Sometimes two or  three cars a night.   This car breaking commenced in December, 1892, and continued continuously up till March 28, 1893, when the killing of  the negro occurred at a car near the depot, and the arrest of the defendant.   There have been no cars robbed since then at all.   I never authorized or consented for any one whatever to break cars.   I never consented for any one whatever to steal goods from the cars.   The cars and goods were all in  my control and management.   I was responsible for them.   If goods and merchandise were stolen out of those cars, it was without my consent.   All this car breaking and stealing from cars occurred in Lamar County, Texas.

W. E. Hunter testified, for  the State:   I commenced working at the Frisco depot about February 1, 1893.   My business was to keep the seals of all cars coming in or going out of this station.   When a train of cars came to this station, I went up one side of the train and down the other, examined all the seals, took the  number of the train, the number of the car, and to what road the car belonged.   If there was a seal broken, I made a note of it in a book furnished me by the company.   If the seal was all right, I also made a note of that in my book.   I continued in the employ of this road until July last.   It was a  frequent thing for cars to be broken at the depot while I worked there; one or more broken almost every night.

The State then asked the  witness if he remembered the car that it was said that some poultry food and a lawn mower was taken from.   The defendant objected to the witness answering, because the question assumed that some poultry food and a lawn mower had been taken from some car; but his objection was by the court overruled, and  the witness testified: That he remembered  said car; that it came  in over the Frisco, from the north, about 3:40 o'clock in the morning of March 9.   I examined the seal on this car that morning  just after it came in, and  found St. Louis seals on both sides of the car.   The car was number 4002, and contained a box

of poultry food, a lawn mower, and some other things that I do not now remember. This car went out on the 12th day of March at 1 o'clock a. m. It came in on the morning of the 9th. On the morning of the 11th of March, I noticed that the seal on this car had been broken; at least, when the car went to go out, I took the seal on it, and found that it had a St. Louis seal on one side and a Paris seal on the other, and from this I judged that the car had been broken open. Cars sometimes come into Paris with the seals broken. I made a note of all seals broken. Don't know what these cars were broken with. I know that this car number 4002 was not broken when it got to Paris; it was in good order.

Cross-examined: A great many cars came in on this road while I staid there. I have no independent recollection of this particular car being broken, except from the entries made in my book at the time the same was broken. It was my general rule to keep this book correct, and I find this entry made by me showing that this particular car was broken that night. I have no other recollection, except by my book, of this car being broken. There were so many broken about this time that it would be impossible for me to remember them all. I mean by a sealed car, that the door is closed, the iron hasp on the door then fits over a staple in wall of car, a tin fastener runs through this, and both ends of tin sealed with a piece of lead and sealing iron; and it takes force to break this seal and open a door.

W. O. Stallings, being introduced by the State, testified as follows: I was check clerk of the St. Louis & San Francisco Railway and the Gulf, Colorado & Santa Fe Railway, at Paris, Texas, in February, 1893, and worked in that capacity up to June, 1893. My business was to check all freight out of the cars destined for Paris, and also to check all cars that came in with the seals broken, or whose seals were broken while in the Paris yard. If the car came in with the seal broken, or if the seal was broken after it came to Paris, the yard master placed the car at the platform for me to check. I made a record of all cars checked by me. This record I have was made by me at the time I worked for the said railroads. I checked all cars whose seals were broken by the original waybills, made out at the office where the cars were loaded. I do not know whether the goods were ever placed in the cars or not. When a car was checked by me, if all the packages named in the waybills were not in the car, I reported them short. In checking up car number 4002, I found a lawn mower short and a box of poultry food. This car was set out for me to check. I found the seal on one side broken. I made this report at the time I checked the car, to the effect that this car number 4002 checked short a lawn mower and a box of poultry food. The poultry food was billed to Navasota, Texas, and the lawn mower to ———, Texas. A box of lawn mowers in the car number 4002 was broken open; there were two lawn mower handles in the box and only one lawn mower, and one lawn

mower was missing. I don't know of my own knowledge where this car was broken open. I know that it had been molested; one seal was broken. I was just called on to check it, and found these articles short.

The State then asked the witness if any other cars had been broken at the Paris station before or after this time; and asked him if he knew of any playing cards, any clothing, or anything else being taken from cars about the middle of March, 1893. Witness replied, " I checked several cars during the months of February, January, and March, 1893, and found several things short."

The witness then turned to a book containing a copy of all the waybills received at the Paris office, and after stating that he did not make the copies, but that he made the entries on said book showing what was short in the cars he checked, then testified: That on February 15, 1893, checked a car by the original waybill and found a hoop of cheese short; on February 14 checked a car and found two butts of tobacco short; on February 17 a car checked one keg cider short, for Blakeley at Ladonia, Texas. I can not remember any other shortage except I look further through this book. Witness then turned through the book and testified: On March 2 a case of lye consigned to Bywaters, at Ladonia, Texas, checked short. On March 3 one bundle of washboards, to W. R. Kirkland, checked short. On the night of March 11 car number 2549 had its seal broken, and a case of goods was broken open, but nothing was gone. On the same night car number 4216 was broken and two cases of shoes, consigned to Wood & Hill, were broken and six pairs shoes gone. On 22nd of March a car of flour was broken and three quarter-sacks checked short. Car number 20,465 was broken on the night of March 22, 1893, and two half-sacks of flour were missing; this car was going to Omaha, Texas. Car number 4035 was broken on the night of March 2; a box had been broken, and all that was left in it was one calf weaner. On January 17 ten one-half butts were taken from a car; I did not check this car up. The book to which I refer in testifying to all these broken cars is a waybill register of freight going south. On March 7, at night, a car was broken and some hats extracted. All of the breakings to which I have testified occurred in Lamar County.

Cross-examined: I can not say that the goods which I checked short were ever put into the boxes. I did not know of my own knowledge that any of the goods in any of the cars which I checked short were ever put in the boxes in the cars. I simply checked all of the goods by the original waybill, and that was the only way that I could tell there was any shortage. The waybills from which I checked the goods were forwarded to the auditors of the Frisco and Santa Fe Railways, and are now on file in the auditor's office in St. Louis. All of those waybills are now in possession of the railway companies. The books to which I have been referring while I was testifying are copies of the original waybills, or of over and under

reports and reports of shortage made in the office at Paris. I did not make the copies. They were made by a clerk in the office. All this occurred in Lamar County, Texas. These waybills are impress copies. I am only testifying about the shortage in car number 4002, about the lawn mower and poultry food that I checked short at that time, and am testifying from notes made by myself, in my own handwriting, at the time I checked said car, in this book; that is, I refresh my mind by these notes as to dates and number of car, etc. There were a great many cars broken during February and March, up until Lee Stevenson was killed, on March 28, when this defendant was arrested, and none after that.

I had to check cars nearly every day, and sometimes two or three. A night or two after checking car number 4002 short I had to check car number 4264. This car was broken. I found in it a large box, about four feet by four feet, containing clothing. The clothing was scattered all over the car floor. This box of clothing was marked on it, consigned to A. W. Dunn, Kaline, Texas. I could not tell what articles of clothing were missing, as the waybill only called for box of clothing for A. W. Dunn, Kaline, Texas. The box was then broken open, and when I checked up clothing that was scattered over floor the box was not full. I nailed up box, and it was sent on to A. W. Dunn, Kaline, Texas. The clothing I found on floor was four pairs pants, 3430; one-half dozen suits, 3310; 5 pairs pants, 3315; nine suits, 3374; twelve coats, lot number 3209; twelve pants, lot number 3209; nine vests, lot number 3209. This car came to us by way of St. Louis. On February 10, 1893, I checked car number 14,529, which was broken. This car came over the Santa Fe, and was destined to Paris. I checked it, and found short one case of playing cards, which the waybill showed was consigned to Hutchison & Elliott, Paris, Texas. This car was full of goods for Paris, Texas.

E. G. Nash, for the State, testified: I went into the service of the Frisco in December, 1892, and January, 1893, and stayed several months. Think I was there in both December and January. I was a check clerk. I know that a number of cars were broken open while I was there; the breaking all occurred at night. On several occasions cars were broken which I had loaded myself, and upon checking them I found several articles of merchandise missing that I had put in them. At one time I missed some tobacco, and at another some side meat which I had put in sacks, and knew they were taken, because I placed them in there myself. These were cars I had loaded and sealed. The doors to all the freight cars are fastened with seals, and can not be broken without breaking seals. When my services as yard or checking clerk stopped, Mr. Stallings followed me. That is, he commenced in February, 1893, and my time was up on January 31, 1893.

J. S. Clayton, for the State, testified: I was in the employ of the Frisco company in December, January, February, and March. I was day

yard clerk. I never checked freight. I inspected all broken seals. There were at least a dozen seals broken during the months above named. The breaking of cars was very frequent. W. E. Hunter was night clerk and I was day clerk.

Cross-examined: All of the cars were broken at night. It was not an unusual occurrence for cars to come in with the seals broken. I never knew of a car being broken in the daytime. All of the breakings to which I have referred occurred in Lamar County, Texas. If a car came in at any time with seal broken, we fixed it at once, right then.

R. T. Polk, for the State, testified: I live at Kaline, Texas, and have been clerking for A. W. Dunn. I was working for him in January, 1893. About that month I bought for the house a bill of clothing from Abe Block & Co., of Cincinnati. I received one consignment all right in January, 1893. I received another consignment about March 20, 1893. There were six pairs of pants, two vests, three full suits, and a few other articles of clothing missing. I think I have seen some of the goods in the sheriff's office here at Paris. The lot number of the vests is 3209; and some of the goods which are in the trunk now in this court room are exactly like those I ordered; the numbers are the same, and they have a very peculiar regulator, which is patented by Abe Block. I am positive that the goods here are the same kind as those I received at Kaline. There were two shipments of clothing from Cincinnati. One came in January; that shipment reached Kaline in good order. The one that came about March 20, 1893, came over the Santa Fe. When it got there to Kaline, in Bell County, Texas, the box showed that it had been opened; the coopering was all broken. The box was about four by four feet; it was marked A. W. Dunn, Kaline, Texas. I found that the bill was short, as I have stated. The clothing here in this trunk is exactly like some that was missing. The numbers are the same; the patent fastening, patented by Abe Block & Co., is the same, and is not on any other goods except Block & Co.'s. These are the goods I saw in the sheriff's office here in Paris last spring, and have seen them there this court. There were some broken suits came through to us, and I find corresponding numbers and same kind of those missing goods here. We put in a claim to the railway.

Cross-examined: I do not know of my own knowledge that all the goods which I ordered were ever put in the boxes which came to Kaline. I did not see them put in the boxes.

E. G. Faulkner, for the State, testified: I was joint car inspector for the Santa Fe and Frisco Railway Companies in the winter of 1893. Quite a number of cars which came in there with the seals all right were afterwards broken open. There were a great many cars broken open during the months of December, February, and March. All the cars broken open at the Union Depot during those months were broken in Lamar

County, Texas. I was with Mr. Shanklin when he tracked the cart from the depot to Jim Dawson's house. It was a continuous thing, nearly every night occurrence, through these months, till defendant was arrested, for cars to be broken. We were on watch every night, but never caught any one till March 28, 1893, when the negro was killed. The night we tracked the hack or cart from where the broken car was was sometime in January, and there was a big slush snow on the ground. We tracked it to Jim Dawson's yard.

Dr. W. C. Elliott, for the State, testified: I was in the drug business in Paris in the winter of 1893. I ordered some playing cards about that time. The cards I ordered were numbered 999, 45, and 808. I never received said cards. The cards shown me now, in this basket, are just like those which I ordered, and the numbers on them are the same; exactly the same brands, and only the three numbers that I ordered.

Cross-examined: I do not know of my own knowledge that the cards which I ordered were ever shipped. The cards which I ordered were three gross decks. I see no other numbers here, nor any other brands, except the one I ordered and never got. I know I got the bill and the bill of lading, but never got the cards. I am a member of the firm of Hutchison & Elliott, here in Paris, Texas.

J. L. Shanklin, for the State, testified: I am city marshal of the city of Paris, and have been several years. About the 17th day of January, 1893, after night, I received a 'phone to come to the Union Depot. I went immediately, and was informed that some persons had been driven away from a car. I went with Faulkner and Cis Ellis, and found that the seal on the car had been broken, but nothing had been taken out. We found the tracks of two men, which showed they had travelled hurriedly, leading from the car to where a two wheeled cart had been hitched to a tree. We then took the trail of the cart, which was about 150 or 200 feet from the car, and followed it in a southwest direction about half a mile, leading away from town and from Jim Dawson's. There was a good deal of snow on the ground, and it was no trouble to follow the trail. The trail led away from Dawson's house for some distance, and then turned east about half a mile, then north about a quarter of a mile, then west, then north to Jim Dawson's house. We followed it through a very large number of streets, a very circuitous route, up to Jim Dawson's house, and into a little lot which was between the residence and the store. When we got there, there was a light in the little store house, and it went out about the time we got there. The pony had just been unhitched from the cart, and was in the lot.

About the 27th of March, 1893, Lee Stevenson was killed at the Union Depot, in breaking a car. I sent a policeman, William Hamilton, to the defendant's house as soon as I got back from where Lee was killed, to guard Jim Dawson's house that night. There were some deputy sher-

iffs on guard too. I was at defendant's house next morning after the killing. I asked defendant to let me search his house. He said he only had two caddies of tobacco in the house and that he could account for them. He said to "go ahead and search," after I had told him that if he did not permit it I would place a guard around the house and search when I got a warrant. We found a great many goods there, including tobacco, shot in sacks, soap, snuff, lawn mower, poultry food, two trunks, spool thread, clothing, etc. I asked the defendant where the playing cards belonged, and he said they belonged to John Dawson. He said his wife had bought the thread from a peddler. We also found two or three caddies of tobacco under the house. We found the cards in a barrel of rain water, and some of the cards in his room under the bed; and we found several caddies of tobacco in the well, sunken in water. The lawn mower was found in the closet; the box of soap was up in the loft. We found a box of poultry food there. We found the trunks in a room of defendant's house; and this trunk was full of ready made clothing; some shirts. This is the trunk here in court, and this is the clothing. Jim Dawson said this room was occupied by his daughters. The lawn mower was a new one; had no handle to it. We did not find any handle. The box of poultry food had marked on it Navasota, Texas. The caddies of tobacco had the marks scratched out; could see where they had been. Jim Dawson told me there was no way up in the garrett. I found a scuttle hole to the garret; found the closet, and we got from the loft a 50-pound box of soap. There was a bushel or two of playing cards and about one-third of a barrel of spool sewing thread in the house, in a flour barrel, partly covered up. We found a number of caddies of tobacco under the wood-pile near the house.

Cross-examined: When we tracked the cart to Dawson's house, we saw no light in Jim Dawson's residence, nor did we hear any noise, but saw a light in the store. John Dawson lived at Jim Dawson's, so I understood.

D. S. Hammond, for the State, testified: I was in the search at Jim Dawson's house. We found the articles about as Mr. Shanklin has stated. I asked Jim Dawson to permit me to make the search, and he very reluctantly permitted it done. The smaller of the two trunks produced in court did not come from Jim Dawson's house. We only found one trunk there. We got the little trunk from a house some distance from Jim Dawson's house. The goods produced in court are the goods which we found at Jim Dawson's house. They have been in my possession since the search. All the goods were found in Lamar County, Texas. Jim Dawson lives in the west part of this city. It is one-fourth or one-half a mile from Jim Dawson's to the depot, where all this car robbery has been done. This clothing, trunks, tobacco, shoes, thread (about one-third of

a barrel), about fifteen caddies of tobacco, and these 244 decks of play-
ing cards, this poultry food, lawn mower, etc., all came from Jim Daw-
son's house; all from his residence, except the box of poultry food, that
came from his premises a few feet from his house. Some of these tobacco
caddies we found submerged in his well of water; in bottom of well on
his gallery. Some tobacco was under his house and under a wood-pile
near his house. These things were all found next morning after killing
of negro at cars. I sent deputies to help watch the house that night.

John Dawson, for the State, testified: I know the defendant; he is my
uncle. I have been living with him since I was 7 or 8 years old. I am
now going on 20 years of age. At the time Lee Stevenson was killed I
was living at defendant's house. Defendant was running a saloon, and
I was running a grocery store in my name for him. I had then been
running the grocery store about two weeks when Lee Stevenson was
killed. About one or one and a half weeks before last Christmas,
Reuben Allen brought some goods to Jim Dawson's house. Lee Stev-
enson also brought some goods there, and John Murphy and another
man whom I did not know brought some. They were all there at
the same time, before Christmas. The lawn mower and poultry food
were brought there at night; on the same night. It might have been
two weeks and it might have been longer after Christmas. The cloth-
ing which is shown in court was brought there while I was absent.
The time it was brought there, I went about 9 o'clock in the daytime to
Atlas to attend to some business for defendant on a farm. I stayed all
day, and got back after dark and after supper, and the clothes were there
when I returned. The playing cards were brought there by Lee and
John Murphy at night. I found out that these things were going on be-
fore Christmas. I saw some things brought there before Christmas. A
short while before Christmas, 1892, I overheard a conversation between
the defendant, Lee Stevenson, John Murphy, Reuben Allen, and another
party whom I did not and do not know, in the defendant's house. De-
fendant told them that they could have his cart and pony, and for what-
ever goods they would get from box cars, houses, or anywhere else, he
would pay them half-price. I knew them to get his cart and pony several
times since. I was at home the night the playing cards were brought
there. It was about 9 o'clock at night; the defendant, Jim Dawson, was
out that night. The pony and cart were out that night.

Defendant was not at home when many of these goods were brought
there. He would leave home at times on the night that goods came in.
He had been somewhere the night the poultry food and lawn mower were
brought there. Defendant was absent when most of these goods were
brought there. He would usually be off somewhere and turn up about
the time the parties would get in with the goods. I said something about
seeing that cars had been broken, in the Paris News. Lee Stevenson and

John Murphy brought the poultry food and lawn mower from one of the railroads. The defendant was out that night about one or one and a half hours. I remember Lee Stevenson and Reuben Allen having the cart and pony out on one snowy night. The night Lee Stevenson was killed, Tom Houston came by and told me to let's go to the band room. I was tending bar that night, and Tom went on, and when I got ready to go I left Jim Garnett in charge of the saloon. The defendant was out that night an hour or an hour and a half.

Cross-examined: The night that Lee Stevenson was killed I went to the band room. Jim Garnett, George Wyatt, and Johnny Wyatt were at the store. Jim Dawson had been away an hour and a half when I went to the band room. I never did hear any one say that Lee Stevenson was killed until I got down to the southeast corner of the square, coming from the band room. Tom Houston and I were going along together, when a Mexican stopped us and told us. Tom Houston did not say, in the band room, about the time we commenced to practice, "Boys, wait; I want to tell you something; a man was killed at the Union Depot to-night."

They either brought the trunks or the lawn mower and poultry food there first after I heard the conversation about getting goods from the cars. It might have been a week or two after I heard this conversation that they commenced bringing things there. I think the conversation occurred about one or one and a half weeks before Christmas, 1892. I think they brought the lawn mower and poultry food the same night. Murphy and Reuben Allen brought the box of soap there. They set it down on the gallery. It was brought there a month or more after the trunks. They brought the tobacco there about four weeks before I was arrested. I saw them bring four or five caddies of tobacco there at that time. I was not with Lee Stevenson on the night that he was killed.

On the snowy night which I referred to, Lee Stevenson and John Murphy came back with the cart and pony; one of them was sweating as if he had been running. Yes, the night was very cold, and they had been running. I reckon they did not run any further than the 150 or 200 feet from the car to the cart. But they were sweating. I am sure of this. One of them said to Jim Dawson, that they had started to open a car and that officers had driven them away.

I am indicted in all the cases that Jim Dawson is, for the same offenses, and made a contract with the State about dinner time, a written contract, by which I agreed to turn State's evidence if they would dismiss all the cases against me. I never had any poultry food in my store. I never sold or offered to sell any of it to any person. I never had any playing cards in my store, nor did I sell or offer to sell any to any person. I never had any soap in my store, and never sold or offered to sell any soap, neither by wholesale or retail, to any person in this city or elsewhere. None of the articles here in court were ever in my store.

Redirect: All that I have stated occurred in Lamar County, Texas. When I would run the store I did so at Jim Dawson's request, to protect it from his creditors. The business was his own, and not mine.

W. D. Nelson, for the defense, testified: I have been in the employ of the Frisco road about six years. I am in charge of the repair gang. Lee Stevenson was killed at the Frisco depot on the night of March 27, 1893. I shot him while breaking a car, or rather just as he came out of it. Another man was with Stevenson; he ran away. To the very best of my judgment, Jim Dawson, the defendant, was not the man who ran away. Stevenson was a man weighing about 170 pounds; the man who ran off was smaller than Stevenson. The defendant is a very large man. I watched those cars at the Frisco a part of every night from January 13 until March 27, and I never at any time saw the defendant about there, or about the depot. Never saw the defendant down there in my life.

Cross-examined: A great many cars were broken open during the months of December, January, February, and March. Cars were broken in the yard while I was watching, and did not know who broke them. I never knew who the man was with Stevenson when I shot him.

Sam Burkham, for the defense, testified: I was at the band room on the night Lee Stevenson was killed. Tom Houston came in there sometime before John Dawson did. John Dawson was very late that night, and did not take part in the practice. Said that he had left his music at home. John Dawson was the last man to come into the band room. Sometime after John Dawson came in, and about the time we began practicing, Tom Houston said, " Wait, boys; I have something to tell you; a man was killed at the Frisco depot to-night."

Cross-examined: We did not ask Houston who it was; it did not particularly interest us, and we paid no very great attention to it. I believe some of us asked him if he wanted us to go down there with him.

Jim Garnett, for the defense, testified: I was at Jim Dawson's beer saloon on the night that Stevenson was killed. I had been working there about a week at that time. I had been there all day, except that about 3 o'clock I went up on to Mill Street, to my mother's, and got my dinner. I was gone about twenty minutes. Jim Dawson was there that night, and did not leave, except that about supper time he left for about ten minutes, saying he was going to supper, and came back in ten minutes. He remained there until about 10 o'clock or half past 10, and went out of the back door, which led to his residence, which was in the same yard, only a short distance away. Jim Dawson was a man who did not leave home but very little after night; he stayed about the saloon about every night until about bedtime, and would then leave, saying that he was going to bed. On the night that Stevenson was killed I tended bar, and no one else. John Dawson did not leave me in charge of the saloon, nor did he tend bar any at all that night, or any other night. John Daw-

son left the premises that night about dark, and I do not know where he went.

Cross-examined: I was to receive one-half the profits on the beer trade which I worked up, which I suppose would amount to about $4 per week. I was friendly with Jim Dawson, and worked for him some last summer. I have not taken a leading part in working up his witnesses and his defense. I have only done what his counsel told me to do, and because he was in jail and could do nothing for himself. I had nothing whatever to do with any goods brought there. I never saw any brought there.

J. D. Conwell, for the defense, testified: I live in this city. I know the defendant and John Dawson. Sometime in January or February, 1893, Mr. W. D. Nelson asked me to get a shot gun and come down to the depot and help watch the cars, and I went. One night while I was watching, a couple of men came by one of the box cars. One of them took hold of the seal and rattled it, and passed on. One of those men was John Dawson. Mr. Nelson was then in a little office near by, asleep, with another party.

Cross-examined: I did tell Mr. Nelson that I had seen John Dawson there, and another man. I think I told him on the same night, or on the morning after Stevenson was killed. I am sure I told him. I did not fire on the men because they did not break the car. I have been about Jim Dawson's place a few times on business. I am not sure that I told Mr. Shanklin about seeing these men, but think I did.

W. D. Nelson, for the State, recalled, said: J. D. Conwell never told me that he saw John Dawson pass by a car and take hold of the seal and rattle it. He did tell me that he saw two men pass by the car, and that one of them rattled the seal; the night he was watching he told me this. Also said that the men passed around the end of the box cars and went into a passenger coach, and that he thought they were car sweepers.

Cross-examined: The night that Conwell was watching, I and another man were asleep in a little office near by. On the day after I shot Lee Stevenson at night, I don't think I saw Joe Conwell. I was somewhat excited that day.

J. L. Shanklin, recalled for the State, testified: J. D. Conwell never told me that he saw John Dawson and another man pass by a box car at the Frisco depot, and that one of them rattled a seal on one of the cars, while he was watching down there. And he also told me that he did not know who they were.

*Park & Nichols* and *Hill & Birmingham*, for appellant.—1. Evidence tending to show the commission of distinct and independent burglaries, committed at other times and places than the burglary in question, is not relevant and is inadmissible. Such evidence does not serve legitimately to throw any light upon the particular burglary for which the defendant

is on trial. Williams v. The State, 6 S. W. Rep., 318; Nixon v. The State, 20 S. W. Rep., 364; Kelley v. The State, 18 Texas Cr. App., 262; Alexander v. The State, 21 Texas Cr. App., 406; Gilbraith v. The State, 41 Texas, 567; Marshall v. The State, 22 S. W. Rep., 878.

2. The court erred in permitting the witness W. O. Stallings to testify, over objection of defendant, that at the time car number 4002 was broken and entered a case of poultry food and a lawn mower were missing from said car, after the witness had testified that he only knew this fact by checking up the contents of said car by the waybill accompanying the same, which waybill was made out at the shipping point; said waybill not being in evidence, and no witness having testified that the lawn mower and poultry food were ever put in said car. The court further erred in overruling the motion made by defendant to exclude such evidence from the jury, which action of the court is fully shown by bill of exceptions number 3.

3. Parol evidence is not admissible to prove the contents of a written instrument, unless the loss or destruction of such instrument be first shown. The waybill being simply a memorandum of the contents of the car, made out by the railway company's employes at the shipping point, would not be admissible in evidence to show contents of said car, as such waybill would only be hearsay as to the defendant in this cause. Sager v. The State, 11 Texas Cr. App., 110; Haun v. The State, 13 Texas Cr. App., 383; Rushing v. The State, 25 Texas Cr. App., 607; Johnson v. The State, 27 Texas Cr. App., 163; Byrd v. The State, 26 Texas Cr. App., 374; Harris v. The State, 1 Texas Cr. App., 74; Felder v. The State, 23 Texas Cr. App., 477; Holt v. The State, 9 Texas Cr. App., 572; Reeves v. The State, 7 Texas Cr. App., 276; Olive & Stinenberg v. Hester, 63 Texas, 190; Burke v. The State, 15 Texas Cr. App., 156; Thomas v. The State, 17 Texas Cr. App., 437.

4. We call the attention of the court to the error, as we believe, in the court overruling the application for a continuance, and in refusing to grant defendant a new trial for such error, and on the ground of newly discovered evidence, which we ask the court to consider in connection.

*R. L. Henry*, Assistant Attorney-General, for the State.

SIMKINS, JUDGE.—Appellant was indicted and convicted of burglary, and his punishment fixed at two years in the penitentiary.

1. Appellant complains that the court erred in overruling his motion for a continuance. As we understand the record, the only evidence of appellant's connection with the burglary was the evidence of John Dawson, that his uncle, the appellant, was absent from home on the night on which the cars were broken open. While the evidence conclusively shows that appellant was receiving the stolen property as fast as it was stolen

from the cars, there is no proof of his personal participation in the burglary itself, outside of the above evidence of John Dawson. Now the said witness denies that he himself was concerned in the burglaries; admits that he was keeping the grocery store for his uncle, but says he never had any of the stolen articles for sale at said store. If in fact he knowingly received and was selling stolen property, he was an accomplice. Now by the absent witness appellant proposed to prove that John Dawson was selling the stolen goods, and in the newly discovered testimony it strongly appears that the witness did have in his possession and sell some of the stolen property, if he was not actually concerned in the burglary itself. No testimony of this character was introduced on the trial. True, one of the witnesses on the trial swore that one night he saw John Dawson when he rattled one of the seals of the cars, but the State contradicted this witness on that point at once. Now the court submitted the question of John Dawson being an accomplice in the burglary. The jury, on the testimony before them, may have believed him not so to be, and have found appellant guilty on his simple statement that appellant was absent on certain nights; and it was also upon this testimony, we presume, that the court based its charge of appellant's keeping watch.

We think the court should have granted a new trial, so as to have allowed appellant to show the complicity of John Dawson in the burglaries.

2. We do not think the court erred in admitting evidence of the waybills. There can be no doubt that the waybill which is made out and sent along with each car is evidence tending to prove that the articles therein mentioned were shipped in said car, as stated in said waybill. It is but a reasonable presumption, from the care and accuracy usually characterizing and absolutely necessary to the conduct of the volume of transportation on the railway. The waybills being entries made by proper clerks in their special departments, and in their line of duty, it would not be necessary to produce the clerk making them, nor the person who in fact loaded the packages on the car, nor the merchant's clerk who originally placed the articles in the box before its delivery to the carrier at its depot. 1 Greenl. on Ev., 115, 116. If the original waybills were admissible, but are shown to be beyond the jurisdiction of the court, parol evidence of their contents would be admissible. The entries made by the clerks at the time of examining the contents of the cars to determine if any of the packages were missing, were admissible also as original testimony. But apart from the question of the admissibility of the waybills, we think the evidence sufficient to establish the fact that the cars were burglarized, and the goods found in appellant's house and on his premises were obtained therefrom. The articles found to be missing from car number 4002 was a lawn mower, a box of poultry food, and other articles. This car came on to Paris on the night of March 9, with St. Louis

seals unbroken.   On the night of the 11th it was broken open.   On being afterwards examined, it was found that a box of poultry food was gone, and a box broken open and one lawn mower and *two handles* left in it. The lawn mower found in defendant's house had no handle.   The finding of these articles, together with a wagon load of stolen articles plundered from the cars, and hid in every conceivable place about appellant's premises, certainly seems sufficient to remove any question of doubt as to the fact that the lawn mower and box of poultry food were in fact taken from car number 4002, as found by the jury.

3.   We do not think the court erred in permitting proof of burglaries prior to and subsequent to the one for which appellant was tried, and the character and kind of articles taken from the cars, most of which were found upon the premises of appellant.

There is quite a difference between separate and independent crimes, though of like character, and a regular system of crime, organized and carried on by a band of criminals, as in the case at bar.   Hennessey's case, 23 Texas Cr. App., 340;  Nixon's case, 31 Texas Crim. Rep., 205; Mason's case, 31 Texas Crim. Rep., 309.

From December, 1892, until March 28 there was an almost nightly robbery of the cars, in spite of the watchmen of the company, and the fruits of the crimes were carried to appellant's house and store.   It was done by the same persons, appellant giving them half the value, or selling and dividing the proceeds.   Appellant was usually absent from his place of business on the nights of the robbery; and his cart and horse were furnished to bring the plunder from the cars to his house.   On the night of the 28th of March one of the conspirators was killed while robbing a car, and a raid was immediately made on the premises of appellant, and a wagon load of articles were discovered concealed about his house and yard.   The robberies ceased immediately after this night.   Many of the articles were identified as coming from the cars.   The evidence as to other robberies was controlled by the charge of the court.   The object of admitting evidence of other stolen property was clearly explained, and the jury were duly cautioned that in passing upon appellant's guilt or innocence they were limited to the burglary of car number 4002, and appellant's connection therewith.

The charge fairly presented all the issues; but for overruling the motion for continuance the judgment is reversed and cause remanded.

*Reversed and remanded.*

Judges all present and concurring.