H. R. LAIRD, Guardian, v. THE EQUITABLE LIFE ASSUR-
ANCE SOCIETY OF THE UNITED STATES, Appellant.

**Impeachment of Witness: COLLATERAL MATTER.** In an action on a
life insurance policy, defendant asserted suicide, while plaintiff
claimed that insured was murdered by her husband. It is admit-
ted that she died from poison. The husband gave testimony tend-
ing to establish suicide. Upon cross-examination he denied telling
his wife, shortly before she died, that she would "run against
a stump, yet," and denied that some time after her death he asked
a physician who made a *post mortem* examination of the body, if
a few hundred dollars would stop the chemist's report. Evidence
to show that these denials were false should not have been admit-
ted, because it is not permissible to draw out immaterial and col-
lateral matter and then to impeach the witness by contradicting
such testimony so elicited.

**REMOTENESS.** Evidence that a month after insured's death a small
quantity of poison of the same kind as that which caused insured's
death was found on the husband's person, is not admissible as
*res gestæ.*

*Appeal from Fremont District Court.*—HON. N. W. MACY,
Judge.

· SATURDAY, MAY 23, 1896.

ACTION at law upon a life insurance policy. Trial
by jury. Verdict and judgment for the plaintiff.
Defendant appeals.—*Reversed.*

*Berryhill & Henry* and *R. C. Campbell* for appel-
lant.

*George E. Draper* and *W. E. Mitchell* for appellee.

ROTHROCK, C. J.—I. The policy of insurance
upon which the action is founded was issued and
dated on the twentieth day of October, 1892, in pur-
suance of a written application therefor, which was

dated September 29 in the same year. It was upon the life of one Fannie Mawhor, and was an undertaking upon the part of the defendant, that in case of her death the defendant would pay to her two minor children, in whose behalf this action was brought, the sum of two thousand dollars. The assured was the wife of William Mawhor, and at the same time that the policy in suit was procured, another policy was issued insuring her life in the sum of three thousand dollars for the benefit of her husband. The insurance was procured by the husband. Mrs. Mawhor died on the twenty-fifth day of October, 1892, a few days after the date of the policy. There is no claim that there were any fraudulent representations made to secure the insurance. The premium therefor was fully paid, and the only matter of controversy between the parties pertains to the cause of the death of the assured. The contract of insurance contains this stipulation: "It is agreed * * * that self-destruction, sane or insane, and death in consequence of violation of law within one year from date thereof, are not risks assumed by the society in the contract." No attack is made by the plaintiff upon the validity of this clause in the contract. It is conceded that if Mrs. Mawhor committed suicide, there can be no recovery on the policy. The defendant made the issue that she destroyed her own life, and the plaintiff's claim, as shown by the evidence and the arguments of counsel, is that she was murdered by her husband. She died very suddenly, and it is conceded by both parties that her death was caused by taking strychnine poison; defendant contending that she took the poison of her own volition, and plaintiff claiming that it was administered to her by her husband, without her knowledge or consent. At the time the insurance was effected, Mawhor and his wife were living on his farm in Fremont county. The family

consisted of the husband and wife, and the two minor children of the wife by a former marriage. Mawhor was a man of about sixty years of age, and his wife was thirty-two years old. He had several children by a previous marriage. None of them were members of the family for some time before the death of the wife. The marriage of the parties occurred about two years before her death. It appears in the arguments of counsel, and it is not disputed, that William Mawhor was indicted for the murder of his wife, and that the place of trial was changed to Pottawattamie county, where he was tried by a jury, and found not guilty. After that he removed to the state of Oregon, where he now resides. His deposition was taken in that state by the defendant, and it was used in evidence in the trial of this case. The defendant filed a motion for a change of the place of trial, on the ground that the inhabitants of Fremont county were so prejudiced against the defendant, because of their belief that Fannie Mawhor was murdered, that a fair and impartial trial could not be had in that county. The application or motion was resisted by a number of affidavits of quite a large number of residents of the county, to the effect that no such prejudice existed in the county, as would prevent a fair trial therein. A number of these persons were brought before the court on the hearing of the motion, and examined, touching the grounds of their belief that the defendant could have a fair trial. The motion was overruled, and the defendant contends that this was error. We have carefully examined the affidavits in support of, and against the motion, and the testimony of the witnesses examined on the hearing, and we conclude that the judgment should not be reversed on this ground. We will not set out the affidavits and evidence. The case made for a change of venue is not nearly so strong as in

many cases in which this court has sustained the district court in overruling like motions.

II. It appears from the record that the defendant assumed the burden of establishing the defense that the deceased committed suicide. The deposition of Mawhor was read to the jury, and a number of witnesses were examined, most of whom appear to have been in some way connected with Mawhor as kindred or relatives. The ultimate fact sought to be established by these witnesses was that Mrs. Mawhor had suicidal tendencies; that she frequently stated that she had prepared poison with intent to take her own life, and failed to take it only because she could not control the muscles of her arms to convey it to her mouth: that on one occasion, when she lived in Kansas City, she did succeed in taking poison, and that her life was saved only after heroic medical treatment. Mawhor testified in his deposition that she took some quinine in capsules the day before the day of her death, and that on the next evening she complained of having toothache, and he stated what occurred as follows: "That evening, before retiring, she said she would take some more of those capsules. She went and got them, and was fingering around in the box, and said: 'Here are the little fellows in here I want to get.' She emptied the capsules out in her hand, and said: 'Here they are, will I take them?' I said, 'Do as you please about it.' She said, 'Supposing they kill me?' I—supposing everything to be all right—replied, 'Well, if they do, you will be dead.' She took them and says, 'Here goes.' I have stated, as near as I recollect, what happened on the last day of her life. That night she was taken with a spasm, called for water, and for the children. The children came. She kissed them good-bye, and told them she was going to die. I sent immediately for Mr. and Mrs. Harris. They came over, and Mr. Harris said he would go for a doctor, which he did.

Mrs. Mawhor died before he returned with the doctor. Before her death, I saw no change in her at all, but after her death it was supposed she was bloated. She had but one spasm, and never lived through it. Her face and hands were wet with a cold, mucky sweat. We both retired between 8 and 9 o'clock. I don't remember the time just now before she spoke to me. She said, 'Get a light, quick; there is something the matter with me.' I did so. She said: 'Send for Harris, and call the children.' I don't recollect the time just now,—how long it was after she retired until she died,—but I think she was a corpse at ten o'clock. Prior to her death there was no strychnine in my house, to my knowledge. I never gave her any strychnine, and never prepared any strychnine so that she might or could take the same." The application for life insurance in the Equitable Life Assurance Society of the United States was at her request. It was made payable two thousand dollars to her children and three thousand dollars to me, entirely at her own request. There was also the testimony of witnesses who were present at the death scene and at the funeral, who testified that the husband manifested no grief,—shed no tears, and exhibited no sorrow on account of his bereavement. To meet this evidence tending to show suicide, the plaintiff introduced a number of witnesses, who stated what they observed of the relations of Mrs. Mawhor to her husband and family and her home. The purport of this evidence was that she was of a lively and cheerful disposition and was very kind and affectionate towards her two children. The children were examined as witnesses, and related what they saw of the last moments of their mother. One of them was about eleven years old, and the other, two years younger, at the time of the mother's death. Their testimony as to what occurred when the fatal dose was taken, does not disclose

that it was strychnine. It was called "quinine," and they did not suspect that it was poison. The testimony of the witnesses for the plaintiff took a wide range. The acts, declarations, and statements of Mawhor were allowed to be detailed to the jury, over the objection of the defendant. Afterwards, in the progress of the trial, all of that testimony was taken from the consideration of the jury, excepting what occurred on the evening and night of the death of Mrs. Mawhor. Their acts and declarations were allowed to be considered as a part of the *res gestæ*, or acts attending the death of the deceased. The defendant does not object to the limit thus put upon the evidence by the court. But the court excepted from this order certain acts and conduct of Mawhor, which the jury were directed that they might consider, not as original evidence in the case, but as impeaching the testimony of Mawhor as a witness. This was objected to by the defendant, and it is insisted that the testimony was not competent, because it was in violation of the well-settled rule of evidence that a party cannot be allowed to examine a witness upon a collateral and immaterial matter, and then introduce evidence in contradiction of the facts testified to by the witnesses, for the purpose of impeachment. In the cross-examination of Mawhor, the following questions were asked, and answered by the witness: "Interrogatory 7. Did you ask Dr. A. O. De Freece, in his office in Sidney, Iowa, on or about the 10th to 13th of November, 1892, who was the coroner of Fremont county, Iowa, 'If a few hundred dollars would not stop the report of the chemist' who was then analyzing the stomach of your deceased wife, or words of like import? Answer. I did not. Int. 8. Did you have any conversation with Mrs. Frazicka Erbeck, your wife's mother, in the presence of your wife and Mrs.

Erbeck, in Riverton township, Fremont county, Iowa, in July or August, 1892, in which you was complaining that your daughter Leah could not stay at home, and your wife says, 'She could stay at home if she wanted to, but she comes home and acts like a stranger, and won't do anything,' and you then said to Mrs. Fannie Mawhor, your wife, 'Never mind, you will run against a stump yet?' Did you use this language, or in substance this, to your wife, at the time and place above mentioned? A. I do not remember of my complaining of my daughter not staying at home to my wife in the presence of her mother. I did not say to her, 'Never mind, you will run yet against a stump.'" The plaintiff called Dr. De Freece, and examined him as a witness, and he testified, that Mawhor inquired of him, 'If a few hundred dollars would stop the report of the chemist?' This was some time after the death of Mrs. Mawhor, and Dr. De Freece was coroner, and had made a *post mortem* examination of the body, and there were suspicions that Mawhor was guilty of murder. In view of the fact that there is nothing in all this record, which in any manner indicates, that there was any thought, by any one, at any time, that the death of Mrs. Mawhor was due to any other cause than poison, we think, that the evidence of Dr. De Freece was incompetent for any purpose. And the conversation with the witness Mrs. Erbeck, was of less significance than that with Dr. De Freece. It appears, that the second marriage of Mawhor created dissatisfaction among his children, and that made more or less friction in the family, and gave rise to the expression: "Never mind, you will run against a stump yet." If these words were put before the jury as tending to show that Mawhor administered the poison to his wife, or that the words were in the nature of a threat against her, they ought not to have been admitted. They did not import a

threat, and they were no more in the way of even censure of his wife than would be expected under the circumstances of a disagreement between the daughter and his wife.

III. The plaintiff was also permitted to prove that a small quantity of strychnine was found on Mawhor's person after he was arrested as a murderer, which was a month after the death of his wife. We think the objection to this evidence should have been sustained on the ground that the time was too remote from the death to be a material fact in the case.

IV. It is strenuously contended that the verdict is without support in the evidence. In view of a reversal for what we regard as errors, as above pointed out, it is better that we should not determine this question. The judgment of the district court is REVERSED.