## A. B. LAWRENCE V. THE STATE.

No. 15550.   Delivered June 23, 1933.
Rehearing Granted May 1, 1935.
Concurring and Dissenting Opinions Filed May 1, 1935.

The opinion states the case.

E. B. Pickett, Jr., of Liberty, H. E. Kahn and E. T. Branch, both of Houston, and A. W. Marshall, of Anahuac, for appellant.

Lloyd W. Davidson, State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, five years in the penitentiary.

Upon rehearing, the original opinion is withdrawn and the following substituted therefor:

Appellant owned a large ranch on which he lived. No other dwellings were near his. Lundy rented land from appellant for rice cultivation, and his house was nearest that of appellant. The rice had been cut and shocked. Ponds, ditches, levies, laterals and much water were around the scene of the shooting, which was in Lundy's rice field not far from the edge of appellant's pasture. The growth between Lundy's field and appellant's house was sparce and scattered, in some places more than others. Appellant's wife was in Houston. She claimed that he came home from Houston on November 16th. No one else seems to have lived at appellant's house. No effort was made to show the presence at or around said house or premises on

November 17th of any person save appellant himself. There was a hard rain on the night of the 16th.

On the morning of November 17th three boys were going across appellant's pasture toward Lundy's rice field. There was one shot gun in the crowd. Emory Fisher, one of said boys, was sixteen years of age and related to appellant. At a certain point Fisher took said gun, left his companions and went some distance away and shot at some ducks on a pond. Just after he fired, the sound of a rifle shot was heard to come from at or near appellant's house. Witnesses located the sound as coming from near a big gate south of the house, the boys being at the time in a general southerly direction from said house. The bullet from this rifle shot knocked up water in said pond near Fisher. He started back toward the other boys. Three more rifle shots were fired from apparently the same place. The other boys said they heard the bullets sing. One of them came so close to Fisher that he turned his head and called out to the others: "The old man like to have got me that time." Testimony was to the effect that from the big gate mentioned parties could be seen down near where the boys were. Evidently the party shooting could see Fisher,—as evidenced by the nearness of the bullets to him. The record is wholly bare of any showing that Fisher, from where he was at the time he was shot at, could not see who was doing the shooting. In bill of exception No. 2, complaining of the admission of the statement quoted above, it is said that in overruling the objection the court stated to appellant's counsel that he could not tell what the deceased saw or knew. The witness testifying to this statement was the first witness introduced on the trial, and testified to said statement almost in the beginning of his testimony.

It is observed that when called on to review rulings of trial courts in such matters, we must pass on the objections as same appear in the record, in the light had by the trial court when he was called on to rule, as far as we can get it. The objections to this testimony was, first, that the statement was not made in the hearing of appellant; second, that no person was named or identified in said statement. The first ground of objection was clearly untenable. The statement was plainly res gestae. The bullets were singing past the heads of Fisher's companions and going in close proximity to him when the statement was made. Four rifle shots were fired, as testified to, from near the big gate up by appellant's house. In five minutes thereafter, as estimated by a witness, another volley of five rifle shots were fired at the same boys,—and beyond question by the same

party, who seemed at this time a little nearer the boys than when the first shots were fired. The first shot of this second volley sent a bullet into Fisher's back going through his body. As one of his companions bent over the fallen boy, another bullet whizzed between his legs and buried itself in the ground. Fisher was carrying the only gun had among the three boys at the time both volleys of rifle shots were fired. As said above, Fisher knew appellant well,—was related to him. Appellant was sixty-seven years old and would reasonably be referred to as an old man. The shooting was all from the general direction of appellant's house and at a party within the view of the one shooting, and there seems no reason to believe but that the party shooting was likely within the view of Fisher when he made the statement. When the language used is such, or used under circumstances which make reasonably evident who the party is therein referred to, it would be admissible testimony, and its weight would be a question for the jury. Many cases appear where no name was used in the res gestae statements held admissible, but in such cases the surroundings sufficiently show to whom reference is made. Thompson v. State, 19 Texas App., 613; Kennedy v. State, 19 Texas App., 631; Means v. State, 10 Texas App., 23; Weathersby v. State, 29 Texas App., 278; McInturf v. State, 20 Texas App., 355; Shumate v. State, 38 Texas Crim. Rep., 266; Foster v. State, 8 Texas App., 251; Lewis v. State, 29 Texas App., 204; Girtman v. State, 73 Texas Crim. Rep., 162; Jeffries v. State, 9 Texas App., 602; Hardison v. State, 85 S. W., 1071.

The rule laid down in Wooley v. State, 64 S. W., 1054; Gray v. State, 47 Texas Crim. Rep., 377; Clark v. State, 56 Texas Crim. Rep., 297; Clements v. State, 61 Texas Crim. Rep., 161, and other cases, relates to the impropriety of receiving testimony reflecting the undisclosed motives and intentions of the injured party causing him to do certain things whose doing was relied on as affording justification for the alleged penal act on the part of the accused and has no application here. We have no doubt of the admissibility of said statement as against the objection urged.

The State offered testimony showing that somewhere in the neighborhood of ten o'clock on the morning of November 17th an officer arrived at the scene of the shooting. He presently went up to appellant's house, finding no one at same. He looked around the premises. Out near the big gate referred to he found tracks made since the rain, but not distinct enough to enable him to identify. Just beyond the gate was grass, and on

this grass some yards from the gate he found three freshly shot shells. The officer went in the house and found in the corner of a room a rifle. He expressed the opinion that the shells he found would fit this rifle. Looking further he found in the horse lot tracks showing where a man had saddled a horse, led him to the gate, and there gotten on him. This would indicate that the tracks in the horse lot were made after the tracks at the big gate, inasmuch as the officer testified that after observing the place where the man got on the horse, he presently saw appellant out east of his house on horseback having some stakes in his arms. He said he waved to appellant who came up, got off his horse, and when he did so the officer compared the tracks then made with those made by the man who led the horse from the lot, and he said they were exactly alike. The officer further testified that there was a telephone in the house. He said no one was called from said house after he got there, but that some thirty minutes later appellant's children began to arrive from a town some ten miles away where they lived. The record is bare of any showing of who gave these children the information concerning appellant which led them to come to the premises. One of them testified that he had heard that appellant was charged with the killing of Fisher. The record does not show that any charge had been made against appellant until after the officer took him away from the premises. Parties who examined the premises and made observations testified that from the big gate mentioned persons down in the vicinity of where the boys were could be seen.

The State offered testimony that on the day before this killing appellant had shot with a rifle at two men who were duck hunting on his place. Dickerson, one of these men, testified that he was calling ducks up to him; suddenly they flew; he raised up to see who had disturbed them, and appellant from some weeds shot at witness, the ball passing near his head. This witness said appellant was too far away to be shot at with a shot gun, so he saw nothing else to do except to fall down for protection in some mud and water behind a levee. From this point he heard a man named Stout shoot at some ducks and saw appellant go toward Stout and later shoot at him with a rifle. Dickerson also testified that at a prior time he and another were hunting ducks in the same vicinity, and appellant rode up, called them to him, cursed them and demanded to know what they were doing and if they did not know that he did not allow hunting on his place. He had his rifle in his hand. He said to the parties that he ought to have killed them

from the hillside, but that he would give them a chance. He ordered them to get their decoys and get away. Witness said he proceeded to gather his decoys, and appellant, who had ridden some distance, fired with his rifle and broke the decoy in the hand of witness. Stout, the other duck hunter, testified that appellant shot at him while he was hunting in Lundy's rice field. Mr. Ivey testified that something like a week before this killing he and another were in appellant's place duck hunting. He said appellant, with a rifle in his hand, came up to them and wanted to know how they came to be in there and what they were doing. They told appellant that they were duck hunting and had permission from Mr. Lundy. Appellant told them Lundy had nothing to do with it, that the land was his, that he had them where he wanted them, and that he had a good mind to kill them and leave them lying there. Objection to all this testimony appears in several bills of exception, on the general ground that same related to separate, disconnected and extraneous offenses and transactions, and was hurtful and prejudicial to appellant.

This was a case of circumstantial evidence. The State's theory evidently was that appellant entertained malice and evil intent toward all hunters of ducks on his place, and that all this testimony was admissible as shedding light on appellant's intent in shooting at deceased who was hunting ducks on appellant's premises when he was killed. We would have no hesitation in saying that in a case like this, where the accused was charged with and convicted of the killing of a young relative of his against whom there is not a suggestion of ill-will or malice on his part save such as might arise out of the fact that deceased was at the time engaged in duck hunting on appellant's premises,—that proof of the fact that appellant entertained animosity and ill-feeling toward all parties who hunted ducks on his land, as evidenced by threats made by him against such hunters as a class, would be receivable in evidence. Such we understand to be the doctrine laid down in Miller v. State, 31 Texas Crim. Rep., 636; Mathis v. State, 34 Texas Crim. Rep., 39; Taylor v. State, 44 Texas Crim. Rep., 549; Helvenston v. State, 53 Texas Crim. Rep., 638; Hiles v. State, 73 Texas Crim. Rep., 21; Hill v. State, 35 Texas Crim. Rep., 375; Russell v. State, 84 Texas Crim. Rep., 245; Martin v. State, 107 Texas Crim. Rep., 164; Paulk v. State, 107 Texas Crim. Rep., 178; Scott v. State, 113 Texas Crim. Rep., 265, and other cases.

We do not think this principle applicable only to cases where proof of malice toward a class rests solely on words spoken by

the accused. It would seem that if mere words can show such malice and evil intent, the deeds of the party could be put before the jury as stronger evidence showing his feeling and animosity in such cases. In Frazier v. State, 93 Texas Crim. Rep., 135, we quoted from Branch's Annotated P. C., sec. 2347 as follows: "Proof of other offenses is admissible if such proof is a part of the res gestae of the alleged offense for which defendant is being tried, or if it tends to show intent when intent is an issue, or serves to prove identity when identity is an issue, or when it is sought to show the guilt of defendant by circumstantial evidence and such proof of another offense connects or tends to connect the defendant with the alleged offense for which he is being tried, or when it tends to defeat the defensive theory. Kelley v. State, 31 Texas Crim. Rep., 211, 20 S. W., 365; Dawson v. State, 32 Texas Crim. Rep., 552, 25 S. W., 21; Mixon v. State, 31 S. W., 408; Fielder v. State, 40 Texas Crim. Rep., 187, 49 S. W., 376; Camarillo v. State, 68 S. W., 795; Bright v. State, 74 S. W., 912; Perry v. State, 78 S. W., 513; Penrice v. State, 105 S. W., 797; Johnson v. State, 52 Texas Crim. Rep., 202, 107 S. W., 52; Snodgrass v. State, 67 Texas Crim. Rep., 480, 148 S. W., 1095; Stephens v. State, 69 Texas Crim. Rep., 379, 154 S. W., 1001; Serrato v. State, 74 Texas Crim. Rep., 413, 171 S. W., 1142; Johns v. State, 76 Texas Crim. Rep., 303, 174 S. W., 610; Nowlin v. State, 76 Texas Crim. Rep., 480, 175 S. W., 1070."

In Meredith v. State, 115 Texas Crim. Rep., 455, Judge Morrow, referring to McKinney v. State, 8 Texas App., 640, quotes therefrom an excerpt from Bishop's Crim. Proc., as follows: "Mr. Bishop announces the correct doctrine to be, 'that though the prisoner is not to be prejudiced in the eyes of the jury by the needless admission of testimony tending to prove another crime, yet, whenever the evidence which tends to prove another crime tends also to prove this one, not merely by showing the prisoner to be a bad man, but by showing the particular bad intent to have existed in his mind at the time when he did the act complained of, it is admissible, and it is also admissible if it really tends thus (as in the facts of most cases it does not) to prove the act itself.' 1 Bishop's Crim. Proc., sec. 1067."

The above quotation, in the opinion of our Presiding Judge, correctly states the rule applicable in determining when, in cases of circumstantial evidence, testimony of extraneous offenses is admissible. It seems to the writer to have exact application in the case at bar. Evidence which shows this appel-

lant to have repeatedly shot at and threatened other men whose only offense was that they were duck hunting on his place, at other times reasonably near to the time of the shooting here complained of,—certainly "tends to prove this one, not merely by showing the prisoner (appellant here) to be a bad man, but by showing the particular bad intent (to assault and shoot at duck hunters on his premises in the instant case) to have existed in his mind when he did the act complained of, and it is admissible if it really tends thus (* * *) to prove the act itself."

In Gardner v. State, 55 Texas Crim. Rep., 402, Judge Davidson uses the following language: "Extraneous and contemporary crimes are sometimes admissible, when they may tend to develop the res gestae, show the intent, system or connect the defendant with the crime for which he is being tried. But this is never the case where there is positive evidence introduced to support the state in regard to the cause on trial."

We said in Haley v. State, 84 Texas Crim. Rep., 629, and the same case on second appeal in 87 Texas Crim. Rep., 519, that testimony showing that the accused had poisoned his wife at a time prior to the killing of the deceased, for whose murder he was on trial, was admissible as showing motive and intent of Haley in the particular matter for which he was on trial.

Texas Jur., vol. 18, sec. 3, contains the following: "Evidence of the commission of similar offenses, although separate and isolated from the crime charged, is admissible for the purpose of showing guilty knowledge or intent, whenever the existence of such knowledge or intent is material and either disputed or doubtful. Indeed, the only mode of showing a present intent is often to be found in proof of a like intent previously entertained. Commission of other crimes may be shown under this rule only when the intent accompanying the act is equivocal, or where the intent otherwise becomes an issue in the trial, as where it is claimed that the act in question was free from a criminal intent, or was the result of mistake, accident or inadvertence." Many authorities are cited.

The State's purpose in the introduction of this testimony is not stated and can only be inferred as we read the record. It may be that the State by reason of its testimony showing that no other person was at the place of the shooting save appellant; the fresh tracks made since the rain out at the big gate near which were found the freshly shot shells; the going away from the house by appellant within a short time after nine rifle shots had been fired so near said house as to cause all witnesses who heard same to swear to their proximity thereto; the finding of

the rifle in the house; the existence of a telephone there; the gathering one by one of appellant's children at his home from a distant town before any charge had been laid, and before even the first investigating party which went to appellant's premises, had gone away, or had any chance to report on what they found there; the res gestae declaration of deceased,—may have been offering this testimony which we have been discussing as bearing on the question of malice vel non of appellant in firing at said party, or it may have been offered on the theory that this being a case of circumstantial evidence, involving two defensive theories, viz.: identity of the accused and lack of intent to kill, that testimony of threats toward the class of duck hunters which embraced deceased, and of previous shooting by appellant at duck hunters, two instances being so near in point of time as to have occurred the day before this homicide, would be admissible as tending to show that appellant was the party who fired the shots. We do not know and can only surmise.

We do not think the principle referred to by us in Weatherred v. State, 272 S. W., 471, cited and relied on by appellant, to be the same as that here involved. The intent, guilty knowledge and malice of appellant were very material issues in this case. When this is true, under the authorities extraneous offenses whose facts are pertinent to the issue of intent, malice, etc., become in many cases important to prove. We think this such a case. We do not think the Wheatherred case, supra, to fall within such group.

There are other bills of exception which we have examined, but which we do not think present any reversible error.

The judgment of reversal is set aside, the original opinion reversing the case is withdrawn, this opinion is substituted, and the judgment of the trial court is now affirmed.

## ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant in his motion for rehearing again urges that bills of exception numbers three (p. 66, Tr.), four (p. 73, Tr.), five (p. 86, Tr.), six (p. 90, Tr.), and seven (p. 94, Tr.), exhibit error which calls for a reversal of the judgment, and further calls attention to the facts that bill of exception number seven was not discussed in the opinion of affirmance.

The record shows that appellant had rented land to Mr. Lundy who cultivated it in rice. It is shown by bill of exception number three that L. G. Dickerson was permitted to testify over appellant's objection that on November 16, 1928, the

day before Emory Fisher was killed, witness and Allen Stout were hunting ducks in the Lundy rice field; that appellant fired at witness with a rifle from a distance of sixty-seven steps, the bullet passing near witness' head; that appellant was inside his pasture at the time; that appellant stood some four or five minutes and then fired at Mr. Stout, who had just killed two ducks. Said testimony was objected to on the ground that it consisted of matters which occurred before the killing of Emory Fisher, had no connection therewith, was testimony of extraneous matter not connected with the case on trial, and that because appellant may have shot at one man was no evidence that he had shot another. It is certified in the bill that it was argued by the State in opening and closing the case that the testimony so objected to showed that appellant was the man who shot Emory Fisher, and that if appellant had so shot at witness it showed what kind of a man appellant was. Bill number four shows that Dickerson also testified over objection that in 1927 he was with another party in a blind shooting ducks in the same vicinity and that on said occasion appellant came near to where they were and called to them; that they left their guns in the blind and walked out to where appellant was sitting on his horse; that he cursed them and said, "Don't you know I don't allow any hunting in here?" that witness told him that the fences were down and they thought it was "wide open"; that appellant then said, "You all get your decoys and get across the bayou. I ought not to have come down here. I ought to have killed you from the hill side, but I will give you a chance"; that witness and his companion started to get their decoys and appellant rode off four or five hundred yards; that as witness picked up a decoy by the head appellant fired with a rifle and burst the decoy in witness' hand. This testimony was objected to for the same reasons shown in bill number three, and for the additional reason that the incident was "too remote in point of time." Bill number five reflects that over appellant's same objection Stout was permitted to testify to the same facts related by Dickerson, as shown in bill number three. Bill number six shows that over appellant's same objection the witness Ivey was permitted to testify that about two weeks prior to the killing of Fisher witness was hunting near appellant's pasture, and appellant ordered him out, saying, "* * * he had a good notion to shoot him (witness) and leave him right there." Bill of exception number seven will be adverted to later.

It must be remembered that in the present case appellant

did not testify; there was no issue of accident or innocent intent. Therefore, the evidence of the other offenses referred to was not provable in rebuttal of a claimed accident or innocent intention. We gather from the record that it was the State's contention that the case being one in which the State relied on circumstantial evidence other offenses were provable upon the issue of identity and animus of appellant, and also to show system.

It ought to be too well settled to require discussion that proof of the commission of offenses by accused other than the one for which he is on trial is not admissible, unless they fall under certain well-known exceptions. In Weatherred v. State, 100 Texas Crim. Rep., 199, 272 S. W., 471, we said: "No principle is better understood than that proof of connection of A with a given crime can not be made by proof of the fact that at a prior time he did a similar thing."

Upon the general principles involved, we quote from Missouri v. State, 109 Texas Crim. Rep., 193, 4 S. W. (2d) 68. "Proof that appellant committed a like offense at another time is not legal evidence that he committed the offense for which he was being tried unless such other offense tended to prove intent, system, or identity, when these are issues. Hill v. State, 44 Texas Crim. Rep., 603. The fact that two or more crimes were committed in the same way does not show system. Long v. State, 39 Texas Crim. Rep., 546; Smith v. State, 52 Texas Crim. Rep., 80. It has been many times held that proof of an independent crime is not admissible by sheer force of the fact that it was committed on the same day or the same night. Woodard v. State, 51 S. W., 1122; Nunn v. State, 60 Texas Crim. Rep., 86; Branch's P. C., p. 99. If it had been shown in this case that the former burglaries had been committed by appellant and that in the instant case the crime was committed in such manner or under such facts as tended to show that the party who committed the last burglary was identical with the one who committed the first *because of certain identifying facts common to both transactions,* the above evidence would have been correctly admitted, upon the issue of identity."

In Story v. State, 107 Texas Crim. Rep., 266, 296 S. W., 296, accused was on trial for robbery. The State proved over objection that there was found upon accused's premises certain property which had been taken from other places than that involved in the robbery for which he was on trial, and at times widely separated from the robbery under investigation. The court held that such evidence ought not to have been admitted,

and then said: "In the language of many authorities, it would seem unquestionably true that to prove against one on trial for the commission of a crime, either by circumstances or by direct testimony, that he had on different and separate occasions committed crimes similar, would be to convince the jury in the particular case that he is a criminal generally, but, unless the matter pertaining to the extraneous crime be a circumstance material in itself to the making out of the particular case, in which event it would be admissible regardless of whether it established an extraneous offense or not, such testimony should not be admitted."

See, also, Williams v. State, 24 Texas App., 412; Hill v. State, 44 Texas Crim. Rep., 603; Lancaster v. State, 82 Texas Crim. Rep., 473, 200 S. W., 167; Nunn and Luster v. State, 60 Texas Crim. Rep., 86.

The courts have so frequently been called upon to state the exceptions to the general rule which excludes proof of other offenses that sometimes loose and unguarded expressions have crept into the opinions, and we are aware of no more misleading statement than the one that "other offenses may be shown where the State relies upon circumstantial evidence." Of course, such statement of the exception is inaccurate and too general. If the broad statement was given application, then in every case of circumstantial evidence the State could prove against the accused the commission of other similar offenses, although they were without logical connection with the offense under investigation. This would be obnoxious to justice and to every well-considered announcement from this court. The correct rule as to such exception is very accurately stated in Texas Jurisprudence, vol. 18, p. 65, as follows: (Italics ours.) "Proof of other offenses is admissible when it is sought to show defendant's guilt by circumstantial evidence and such proof connects or tends to connect the defendant with the offense for which he is on trial. In other words, evidence tending to make out the guilt of the accused by a chain of circumstances is not rendered inadmissible merely because *one or more links* of that chain tend to prove him guilty of other crimes."

Bateman v. State, 81 Texas Crim. Rep., 73, 193 S. W., 666, illustrates the true exception when proof of other offenses may be admitted upon the issue of identity. Bateman was on trial for robbery which was alleged to have occurred at a barn where three parties participated in robbing some negroes. The negroes *there* robbed could not identify any of the robbers. The three robbers who were at the barn went from there in a car driven

by a jitney driver to where other negroes were assembled in some sort of celebration, and there began a series of acts, exhibiting and shooting their pistols, and there robbed at least two parties of something like seven dollars. The driver of the car identified Bateman as one of the parties who left his car and went to the barn. At the social function Bateman was recognized as one of those engaged in the robbery there. In holding admissible evidence of the identity of Bateman as one of the robbers at the negro entertainment this court said: "The objection urged to the introduction of this testimony was that it was developing another crime, which it is contended was illegitimate and the evidence inadmissible. We would be inclined to agree with this proposition if appellant had been clearly identified at the time as one of the parties to the transaction relied upon by the State for conviction, but as this was not the case we are of opinion the court did not err in admitting the evidence of identification at the other times and places mentioned."

Proof of the identification of Bateman as one of the robbers at the negro entertainment was not admissible because Bateman had committed another robbery, but because it was a *link* in the chain of evidence which fixed his identity as one of the robbers at the barn.

Another case illustrating the true limitation where the State relied on circumstantial evidence is Boyd and Standley v. United States, U. S. Sup. Ct. Rep., 139-142, Book 35, p. 1077, 142 U. S., 450.

Boyd and Standley were upon trial for the murder of one Dansby. The evidence of the Government was to the effect that on the night of April 6, 1890, Boyd and his companions killed Dansby while engaged in an effort to rob one Byrd. The evidence left the identity of the murderers in some doubt. Over objection of defendant the Government proved that Boyd and some of his companions on the evening of April 5, 1890, had robbed a man by the name of Rigsby, and that on March 15th they robbed Brinson and Mode, and that in the afternoon of March 17th they robbed Robert Allen, and on the night of March 20th they robbed one Taylor. Property taken from Rigsby at the time he was robbed was found upon the person of one of Boyd's companions who was present at the time Dansby was killed. The other robberies proven apparently had no connection with the case on trial further than to show that Boyd and his companions were robbers generally. The Supreme Court of the United States held the testimony as to the robbery

of Rigsby was properly admitted because finding the property taken from Rigsby tended to identify Boyd and his companions as the ones who had killed Dansby, but held proof of the other robberies inadmissible for any purpose. In passing upon the question the court said regarding the other robberies: "Those robberies may have been committed by the defendants in March, and yet they may have been innocent of the murder of Dansby in April. Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death. Upon a careful scrutiny of the record we are constrained to hold that, in at least the particulars to which we have adverted, those rules were not observed at the trial below. However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged."

In Wyatt v. State, 55 Texas Crim. Rep., 73, 114 S. W., 812, Judge Ramsey agreed with the majority of the court that certain identifying testimony was admissible, but dissented upon the point that it was necessary to limit such testimony. In stating his views he said: "I hold these truths to be self-evident: (1) That where it is sought to identify a defendant as the person guilty of a crime for which in any case he is on trial, that proof of extraneous crimes is never admissible unless it is of such character as furnishes evidence of his *identity and connection* with the offense then being tried; (2) that the converse of this proposition is equally true, and if such proof does establish his identity and connection with the offense being tried, same is always admissible; (3) that in such case the evidence of other offenses is *not admissible, merely because there are other offenses, but as links in the chain* of inculpatory and incriminatory facts which trace the movements of the defendant, *locate him at the place* of the crime for which he is being tried, and connect him therewith. * * *" (Italics ours).

In Musgrave v. State, 28 Texas App., 57, the defendant was on trial for theft of a bay mare belonging to one Brown. Upon the trial the State proved over objection that at the time appellant was arrested he was also found in possession of a gray horse which had been stolen from another party, not however, at the time the Brown mare was taken. In passing

upon the question raised by the objection this court, speaking through Judge Hurt, said: "Such evidence is received also for the purpose of *completing the chain of circumstances* relied upon to establish the guilt of accused. This is a simple proposition when understood. If the theft of another horse constitutes a fact in the *chain of facts—circumstances—which connect* the accused with the theft of the horse for which he is being tried, this theft is admissible in evidence, not because the fact introduced is theft of a horse, but because it is a criminative fact. * * * Now, if the pony and mare had been taken at the same time this fact was competent evidence, but in the absence of such proof we can not possibly perceive what bearing the theft of the pony has upon this case. It certainly develops no criminative facts nor does it explain a competent fact, nor even yet is it a relative fact, *constituting a link* in a chain of facts tending to establish the guilt of the appellant. Hence it could serve but one purpose, which was to unjustly prejudice the case of the appellant in the estimation of his triers."

Upon the same point, see, also, Lancaster v. State, 82 Texas Crim. Rep., 473, 200 S. W., 167.

The conduct of appellant towards Dickerson, Stout and Ivey constituted no link in a chain of evidence such as is contemplated in the authorities. It simply furnished a predicate for the conclusion that appellant was a bad man generally, and because he did the things towards the named parties he therefore did, or was likely to do, the thing which resulted in young Fisher's death.

Reverting now to the State's other contention that proof of the other offenses by appellant was admissible to show "system." The use of this unqualified term as defining or pointing out another exception to the general rule which excludes proof of extraneous crimes has been productive of much confusion. It has been held many times that the fact that two or more crimes were committed in the same way does not show system. Long v. State, 39 Texas Crim. Rep., 546; Smith v. State, 52 Texas Crim. Rep., 80; Missouri v. State, 109 Texas Crim. Rep., 193, 4 S. W. (2d) 68. The mere fact that two or more distinct crimes were committed in the same way, or even in pursuance of the same conspiracy does not show system. Hunt v. State, 89 Texas Crim. Rep., 89, 229 S. W., 869; Cone v. State, 86 Texas Crim. Rep., 291, 216 S. W., 190; Long v. State, 39 Texas Crim. Rep., 537, 47 S. W., 363; Smith v. State, 52 Texas Crim. Rep., 80, 105 S. W., 501. In the last case cited it appeared that it was the theory of the State that Smith and Capers en-

tered into a conspiracy to commit the crime of arson as to different houses. Capers testified against Smith, and on the trial the court permitted testimony with reference to arson as to other houses than that charged. In writing upon this question Judge Davidson said: "These transactions were independent of the one for which this conviction was obtained. The court seemed to believe, from his qualification of the bill, that, if there was a conspiracy to burn houses, this would permit evidence of all the other cases of arson testified by Capers, on the theory of system. Where evidence of an extraneous kind is admitted, it must be to show intent to develop the res gestae, identity of the defendant, or show system. That a party may be systematically a thief, or destroyer of houses by burning, or in the participancy or execution of a crime, does not necessarily come within the exceptions above mentioned. *To prove system in order to identify a party, or to show intent,* is one thing, but to prove systematic crime, or that an accused is a confirmed violator of the law is a very different proposition. And extraneous crimes are not admissible, even under the exceptions to the rule, unless the testimony comes within one of the exceptions, and this to connect the defendant with the crime for which he is being tried."

In Mayes v. State, 118 Texas Crim. Rep., 612, 42 S. W., 65, the State's evidence showed that appellant gave Mr. Deats a check for $150 in exchange for some horses. Payment of the check was refused. Over objection the State also showed that on the day before the Deats transaction appellant had given Mr. Slator a check for $545 which was also in exchange for some horses. The Slator check was also returned unpaid. The State took the position that in as much as the Slator transaction was similar in all respects to the Deats transaction and occurred only the day before that it was admissible to show system. This court disapproved such proposition, saying, "similarity of transactions, and proximity of time thereof, does not of itself constitute system," and quoted with approval from Long v. State, 39 Texas Crim. Rep., 545, 47 S. W., 363, as follows: "Now, we hold that because an offense has been committed by a defendant in the same manner that the offense charged may have been committed does not constitute this separate offense a part of a system. The fact that two distinct crimes may have been committed in the same way does not, in our opinion, constitute a system, as meant by the authorities treating of this subject."

We quote further from the Long opinion as follows: "If

these independent acts constituted a system, and if proof of such collateral offenses could be offered to connect a defendant with the offense charged, because such other offenses were likely perpetrated in the same way as the one for which he was being tried, then, in every case in which appellant was shown to have committed similar offenses, proof of such offenses could be made in order to identify or connect him with the case for which he was on trial. To illustrate: Suppose A is on trial for the theft of a horse, and the proof should show that it was taken in a particular manner, but there was no proof identifying or connecting A with the theft of said horse; then, in order to connect him with such offense, and to show that he was the guilty party, if the contention of the State be correct, if he had been convicted of the theft of other horses committed in a similar manner, proof of such collateral crimes could be introduced in evidence, as testimony tending to show that he was guilty of the offense charged against him. This we do not understand to be the rule; but this was exactly what was done in this case, —that is, proof of independent offenses was introduced by the State as testimony tending to connect defendant with the main offense, for the purpose of corroborating the accomplice's evidence. * * * *We hold that the court erred in admitting said evidence for any purpose.''*

Our court did hold in the Mayes case (supra) that evidence of the Slator transaction was admissible to rebut appellant's claim of good faith, and of his assertion that he had no intent to defraud at the time he gave the Deats check. There is no question of good faith or innocent intent in the instant case.

Upon the question of *similarity* of offenses it would not be inappropriate at this point to call attention to one striking *dissimilarity* in the transaction which resulted in Fisher's death, and the ones related by Dickerson, Stout and Ivey. There can be no doubt from the record that whoever killed Fisher was more than a half mile away, and concealed. In the other transactions proven over objection there was no effort on the part of appellant to conceal his identity. He came out boldly in the open and up to the parties he was dealing with.

Upon original submission the present writer entertained the view that the evidence under consideration was admissible upon the *principle* that proof of threats directed against a class was provable if deceased fell within the class embraced in such threat. That such principle has long been recognized and given application is clear from the cases cited on the point in the judgment of affirmance. After more mature thought, and

further investigation of the record, the writer has reached the conclusion that the reasoning which lead to his former view in regard to the matter was at fault. Equally as well recognized as the principle above referred to is another, viz.: That evidence of general threats made by an accused is not admissible when such threats are not shown to have been directed towards deceased, or to embrace him. Godwin v. State, 38 Texas Crim. Rep.; 469, 43 S. W., 336, and other cases listed under Sec. 2073, Branch's Ann. Tex. P. C., at page 1167. It is also well settled that it is error to prove that accused made threats against others than deceased when such threats are distinct and independent and could only serve the purpose of showing that accused was a bad man generally. (See Branch, supra). Now the State's proposition here being considered is that it having been shown that appellant had his land "posted" against hunting thereon, the evidence of Dickerson, Stout and Ivey as to the violent conduct of appellant towards them was admissible to show his malice, and malignant disposition generally towards "duck hunters," which included deceased. Suppose there had been no act of violence towards Dickerson and his companions in 1927, nor towards the same Dickerson and one Stout on the day before Fisher was killed, nor toward Ivey some two weeks before such killing, but the State had proposed to prove that in 1927 appellant had made a threat that if Dickerson and another party came on his (appellant's) place duck hunting he was going to run them out, and told them he ought to have shot them from the hill side, and that he intended to shoot the decoy out of Dickerson's hand when he started to leave; also that the State proposed to prove that on the day before Fisher was killed appellant was heard to say that if Ivey came on appellant's place hunting he would have a "good notion to shoot" Ivey and leave him there, and that appellant intended to run Ivey off the place. Now in none of this suppositional testimony is Fisher named, or referred to. It relates to threats of violence towards named parties, on three different occasions; one party, Dickerson, being referred to twice. Under our authorities such proposed testimony would not have been admissible in a trial against appellant for killing Fisher, because it would not constitute a general threat of violence towards a class which might include Fisher, but would have been specific threats of violence towards individuals by name, although such individuals might be duck hunters, as also was Fisher. Appellant might for some reason object to the hunting on his premises of Ivey, and Dickerson, or of any one accompanying the latter. If proof

of threats of violence towards the named parties would not be admissible, on what reasoning would the specific acts of violence towards them be any more admissible? If the State could have shown that appellant used violence toward every hunter who came on his premises from 1927 up to the time of the killing it would have much nearer approximated an application of the principle of a general threat against a class. (We are not unmindful of the fact that appellant had leased a part of his premises to  hunting club at Houston, and we have no reference to hunting on the leased premises.) The State has picked out three isolated transactions that occurred over a year's space of time, and is seeking to base thereon a .deduction of appellant's general attitude. Is there in the record proof of hunting by others than those mentioned? Evidence upon this point came into the record from witnesses both for the State and appellant, and was developed as a result of appellant's attempt to show that there were people other than appellant who hunted with rifles in the vicinity of the killing. William Nelson, a State's witness, and one of the boys who was with Fisher at the time of the killing, testified as follows: "I never hunted in that (the east) part of the pasture. The only part I hunted in was just around those ponds in the rice fields, right around close to Mr. Lawrence's house."

It will be remembered that the killing occurred on November 17th. The evidence of Dickerson and Stout complained of in bills of exception three and five was that appellant had shot at them on the evening of November 16th. Dickerson further testified: "I was down there before that date duck hunting, on the evening of the fifteenth, on the ninth and twelfth."

W. C. (Will) Lundy, a State's witness, and the man who had rented land from appellant and in whose rice field Dickerson and Stout were hunting on November 16th, testified: "I have seen people around there, hunters, men that I did not know. * * * There had been men down there who wanted to use a rifle and I told them no. That was my orders in the field, not to shoot any rifles, because I told them not to bring them in * * * I went out there in the field, too, some, and they had shot guns where they were shooting ducks. They had little places fixed up in the field, calling ducks, and they had shot guns."

John Shearer testified for appellant. He had frequently heard rifle shooting about appellant's pasture, covering a period of twenty years. He said: "It was like the fourth of July in the opening of the duck season. That has been continuous

during the game season, up to the present time. * * * Those fellows were down there shooting in all directions and the bullets were whistling through the air. That went back from the time there was a duck season. There have been hunters in there continuously during the duck season."

Harry Polk, a witness for appellant, was a member of the hunting club that had 2000 acres leased from appellant. He testified that he did all his hunting and had for two years on the leased land, and had never hunted around appellant's house, but said: "There is a place up there southwest of Mr. Lawrence's house where there is a lot of shooting. I do not know whether it is a rice field or not. There has not been any rice planted in there in the last two years. * * * I have heard a lot of shooting over there."

Jim Dutton, a witness for appellant, testified: "During the hunting seasons many hunters come down in those different pastures to hunt. I have been down in there for the past four or five years during every hunting season. I am in there every day. I hardly ever went out in the Lawrence place during the hunting season."

Ben Dutton, a witness for appellant, testified that he was frequently through the Lawrence place and that in making those trips: "I travel across Mr. Lawrence's pasture. * * * In going through there during the hunting seasons I never paid much attention to the hunters in the Lundy rice field. There has always been more or less shooting. I did not pay any attention to them. I took notice at times of hunting along in the vicinity of that roadway that I often traveled during the hunting seasons. I never saw any hunters in there with high-powered rifles."

Eb Fisher, a witness for appellant, testified: "As I would be down in Mr. Lawrence's neighborhood, and in his pasture as I went about the business of butchering in the hunting seasons of 1926, 1927 and 1928, I would frequently see hunters in the Lundy rice field."

The evidence of the foregoing witnesses makes it clear that hunting was general on the premises of appellant, and in the Lundy rice field during the time mentioned, and yet the State picks out three transactions, and on them relies to make out against appellant a general violent and malignant disposition towards all hunters, which would include Fisher. The recital of the foregoing evidence seems to demonstrate the error in admitting proof of the three transactions testified about by Dickerson, Stout and Ivey.

Bill of exception number seven, mentioned in the beginning of this opinion is now reverted to. Said bill seems to have been overlooked in our original opinion. It reflects that appellant's son, Fenton Lawrence, had testified for his father, no reference being made upon his direct examination to the matter elicited from him on cross-examination over appellant's objection. The State drew from him on cross-examination the following testimony: "I have not seen him out there trying to run people off with his rifle (referring to defendant). I have been out there when he had a rifle in his hand. I have not been out there when he was running the people that were in his pasture off with a rifle. I have been out there when he had a rifle in his hand. I was there when Mr. R. R. Bush was there. He (meaning defendant) had a rifle then. He bawled Mr. Bush out. He (meaning defendant) ordered him off the place. He had a rifle."

It is certified that Bush was not called as a witness. The evidence as above set out was objected to on the ground that it was irrelevant, was an isolated transaction, had no connection with the killing of Fisher, that the Bush transaction was not shown to have been unlawful, and that the time of such incident was not shown. Under no rule of evidence, nor under an exception to any rule, does such testimony seem to be admissible. There is no showing even that Bush was hunting ducks or anything else on appellant's premises, or that Bush even had a gun on the occasion. Appellant may have had perfectly good reasons to order Bush off the place, and may have been within his legal rights in what he did. The incident could have been appropriated by the jury but for the purpose of finding that appellant was generally a man of violent disposition and therefore a man who would likely shoot Fisher. Under the present record it is difficult to discover upon what theory the State urged the admission of such testimony. It is not even brought within the scope of the State's position claiming admissibility of the testimony of Dickerson, Stout and Ivey.

The evidence admitted over objection furnished basis for the argument that the same party who had been guilty of violence towards Dickerson, Stout and Ivey must have been the one who fired the shots which resulted in the death of Fisher. The language of Judge O'Brien in the celebrated case of People v. Molineaux, 168 N. Y., 264, 62 L. R. A., 193, seems pertinent here: "We may attempt to deceive ourselves with words and phrases by arguing that it is admissible to prove intent, or

identity, or the absence of mistake, or something else, in order to bring the case within some exception to the general rule; but what is in the mind all the time is the thought, so difficult to suppress, that the vicious and criminal agency that caused the death of Barnet also caused the death of Mrs. Adams."

Because of the very thing suggested by the learned judge just quoted it has always been held by our court that proof of other offenses would be excluded unless they fell under some well-known exception. Proof of them here seems not justified unless some exception be extended or a new one established. To do either would appear unwise.

From what has been said it follows that we have reached the conclusion that error is exhibited by bills of exception numbers three, four, five, six and seven, which necessarily resulted in injury to appellant, and that appellant's motion for rehearing should be granted, the judgment of affirmance set aside, and the judgment of the trial court be reversed and the cause remanded, and it is so ordered.

*Reversed and remanded.*

MORROW, PRESIDING JUDGE (Concurring).—On the original submission of this case the views of the writer were not in accord with the disposition made of the appeal. No dissenting opinion was written for the reason that the majority of the court favored an affirmance of the judgment and the probability of a motion for rehearing would afford the writer an opportunity to express his views if deemed desirable. Of such attitude of the writer his associates were informed. On the present presentation of the views of the members of the court, the opinion of the writer is in accord with the conclusion reached and stated by the writer of the opinion ordering a reversal of the judgment.

Direct testimony identifying the accused as the offender is entirely lacking. Many of the relevant circumstances implicating him and upon which the conviction may have been founded are deemed to have been improperly received in evidence. On that subject the opinion of Judge Hawkins, in which the writer concurs, is regarded as conclusive.

LATTIMORE, JUDGE (Dissenting).—Our original opinion in this case held admissible proof that on various occasions, other than and prior to the shooting of Emory Fisher,—appellant had shot at and threatened to shoot different persons against whom he had no personal ill-will or malice, save that they were hunting on his place without his permission. The

purpose of the admission of this testimony was threefold: First, to prove the identity of appellant as him who did the shooting; second, to show his motive, and that the shooting was purposeful, and to show system and custom on the part of appellant of shooting at and threatening people who hunted on his land without permission,—the case being one dependent on circumstantial evidence. No effort was made by the State to prove malice or ill-will of appellant directed toward Emory Fisher, who was but a boy and distantly related to appellant,—but reliance was had on the well established rule that malice against an individual is sufficiently established by proof of a reckless disregard of human life, or of malice entertained by the accused against a class or group to which the deceased belonged. See Banks v. State, 85 Texas Crim. Rep., 165; 211 S. W., 217; Dyer v. State, 96 Texas Crim. Rep., 303; Bilyeu v. State, 103 Texas Crim. Rep., 27; Simmons v. State, 113 Texas Crim. Rep., 55. In Godwin v. State, 38 Texas Crim. Rep., 466, followed by Fossett v. State, 41 Texas Crim. Rep., 400; Earles v. State, 47 Texas Crim. Rep., 563; Green v. State, 90 Texas Crim. Rep., 149, and others, we upheld the doctrine that threats directed at a class or group which comprehended the injured party, were admissible on the question of the motive or malice of the accused. See, also, Miller v. State, 31 Texas Crim. Rep., 637, and cases from other jurisdictions. In People v. Coughlin, 13 Utah, 58, where the accused said of officers, "Let them come; I am ready for them," and later was prosecuted for killing an officer who attempted to arrest him,—proof of the threat was upheld. See Campbell v. State, 15 Texas App., 506; Rafferty v. People, 72 Ill., 37; Palmer v. People, 138 Ill., 356. In State v. Davis, 6 Idaho, 159, 53 Pac., 678, it was held, and I think correctly, that on trial of one accused of killing one of a class of persons, proof was admissible that the accused had threatened all members of that class, and that a short time before the alleged homicide he had attempted to kill other members of the same class. Threats to get even with every witness against him in a certain case, held admissible on a trial for murder of one of said witnesses. Commonwealth v. Chase, 147 Mass., 597; Wheeler v. State, 158 Ind., 687. A statement that some of the Callon boys would die with their boots on, held admissible on a charge of killing one of said boys. Laird v. Life Assurance Society, 98 Iowa, 495. Threats to kill policemen generally, held admissible where the charge was killing a policeman. State v. McNally, 87 Mo., 649; Dixon v. State, 13 Fla., 636. Threats against sheepmen generally, held admissible on a trial of one

charged with killing a sheepman. State v. Davis, 6 Idaho, 159. "I am going over there and get me a nigger," held admissible on trial of accused for killing a negro. Harris v. State, 109 Ga., 280. In Guiteau's celebrated trial for killing President Garfield, a threat was held admissible to kill some of our public men. Many other citations might be made, but we think the soundness of the rule will not be combated.

Is it sound to object to such proof on the ground that it may or does amount to proof of extraneous offenses? Let us see. In McKinney v. State, 8 Texas App., 639-640, we said: "Mr. Greenleaf says: 'In some cases, however, evidence has been received of facts which happened before or after the principal transaction, which had no direct or apparent connection with it; and therefore their admission might seem at first view to constitute an exception to this rule (which excludes evidence of collateral facts.) But those will be found to have been cases in which the knowledge or intent of the party was a material fact on which the evidence, apparently collateral and foreign to the main subject, had a direct bearing, and was therefore admitted.' 1 Greenl. on Ev., sec. 53. Upon a trial for murder, former grudges and evidence of former quarrels between the parties, and antecedent menaces, may always be shown to prove motive and the prisoner's malice against deceased. 2 Ph. on Ev. 169; Roscoe's Cr. Ev., 71; McCoy v. The State, 25 Texas, 33; Carr v. The State, 41 Texas, 543; Dill v. The State, 1 Texas App., 278. 'There can be no question that the acts, the declarations, and the conduct generally of a party charged with the commission of an offense, both before and after its alleged commission, are competent to be proved upon the trial to establish any fact essential to be proved, if they tend legitimately to establish such fact, and they are competent to establish the existence of motive as any other fact. Motive is a minor or auxiliary fact, from which, when established, in connection with other necessary facts, the main or primary fact of guilt may be inferred; and it may be established by circumstantial evidence, the same as any other fact. The proper inquiry is, does it fairly tend to raise an inference in favor of the existence of the fact to be proved. If it does, it is admissible, whether such fact be innocent or criminal in its character.' 3 Park. Cr., 681; Whart. on Hom., sec. 598; Hudson v. The State, 61 Ala., 333; Pierson v. The People, 18 Hun., 239; 1 Bishop's Cr. Proc., sec. 1065.

"Mr. Bishop announces the correct doctrine to be, 'that though the prisoner is not to be prejudiced in the eyes of the

jury by the needless admission of testimony tending to prove another crime, yet, whenever the evidence which tends to prove the other crime tends also to prove this one, not merely by showing the prisoner to be a bad man, but by showing the particular bad intent to have existed in his mind at the time when he did the act complained of, it is admissible, and it is also admissible if it really tends thus (as in the facts of most cases it does not) to prove the act itself.' 1 Bishop's Cr. Proc., sec. 1067."

Supporting and extending this doctrine, Mr. Branch in his admirable Annotated P. C., sec. 166, says: "When an extraneous crime or other transaction * * * tends to show intent when intent is an issue, or tends to connect the defendant with the offense for which he is on trial when identity is an issue, proof of extraneous offenses is admissible." The author cites hundreds of cases. He also says in the same section: "Proof of other offenses is not admissible to show system, intent or identity, unless some of these matters are in issue," which is beyond doubt sound. Again in section 1882 of the same work, Mr. Branch says: "Proof of facts which show motive is admissible although it involves proof of an extraneous crime." Also he further says: "The mere fact that in proving motive for a homicide or an assault a separate crime may be proved, does not render proof of such motive inadmissible." Again in section 1883, upon numerous citations, the author says: "Remoteness of the act or acts proven for the purpose of showing motive, may go to the probative force of the testimony, but the fact that such testimony is remote is not of itself a reason for excluding it if there is a logical connection between it and the particular act under investigation." Again in section 1872, the same author says: "When a foul assassination has occurred and the circumstances attending and surrounding it are shrouded in mystery, the command of the law is, 'Turn on the light,'" citing Preston v. State, 8 Texas App., 33; also he says the mind seeks to explore every possible source from which any light, however, feeble, may be derived, citing Early v. State, 9 Texas App., 485, and other cases. He also says that "every fact and circumstance reasonably calculated to illuminate the transaction should be permitted to go to and be weighed by the jury," supporting which are cited many cases.

In the view of the writer, every observation just quoted or stated is true and has direct application to the case before us. Here a boy, innocent of wrongdoing,—except that he had just shot at a duck on the premises of this appellant without per-

mission,—was shot through the body by a rifle and killed under circumstances that strongly support the inference that he who fired this shot, and other shots at the same time and place, intended it and them to either strike deceased or to pass so near to him as to evidence the feeling and bitter objection of the party shooting toward hunters on his place without permission.

At the risk of repetition and for the sake of connected reasoning, I restate the facts. Fisher and two other boys were crossing appellant's pasture in the early morning, Fisher alone having a gun. At the same time Mr. Charlton was hunting in a near-by rice field belonging to appellant, and in which field young Fisher was presently killed. Charlton was hunting without permission. He shot at a duck. The testimony is positive that pro and con shots fired in said rice field could be heard at appellant's house, where he was shown to have been that morning alone. About ten minutes after Charlton shot, Fisher left his two boy companions near the fence between appellant's pasture and said rice field,—stepped off a little way and shot at some ducks. Almost simultaneously with the firing of his gun, rifle shots began from a point near appellant's big gate, some hundreds of yards from his house, and Fisher's companions testified that they could hear the bullets singing through the air and see them knocking up water and mud near Fisher. Four rifle shots were fired. As one came by him Fisher ducked his head and called to his comrades and said "The old man liked to have gotten me that time." He came at once back to the other two, and the three got through the fence into said rice field and started walking abreast away from the direction of appellant's house. Fisher was in the middle. In a few moments from another point, still in the general direction of appellant's house but apparently nearer where the boys were, five more rifle shots were fired. The first bullet entered Fisher's back, passed through his body, came out his breast, and he fell dead.

No witness saw who shot or could testify to personal malice of appellant. Appellant pleaded not guilty, but did not testify. He introduced a number of witnesses who swore that during the hunting season much hunting was done in that vicinity by persons using high powered rifles, many of these witnesses saying they heard the bullets singing through the air. The only purpose of such testimony apparently could be to support or suggest to the jury the theory of an accidental shooting of Fisher by some unknown hunter.

Appellant's plea of not guilty put upon the State the burden of proving beyond a reasonable doubt that he did the shooting,

and that he was actuated by malice toward Fisher, or toward some class or group to which Fisher belonged, or that in such shooting he manifested such reckless disregard for human life as, under the circumstances, showed a heart regardless of social duty and fatally bent on mischief. Having no direct testimony to establish these issues, the State was compelled to resort to circumstantial evidence.

A number of witnesses swore that each volley of rifle shots, above referred to, came from the general direction of appellant's house where it was shown he was alone that morning. Several testified that the first volley came from the direction of appellant's big gate, and later near this gate were found several empty rifle cartridges and tracks of a human being which were said to look like tracks made by appellant at another place that morning. It was demonstrated that the shots in the first volley were not at the companions of Fisher, who were some little distance from him,—but were at him, and at him only after he shot at the ducks. Both of the other boys swore they saw the water and mud knocked up near Fisher by the bullets. Whoever fired the next volley apparently knew who had fired at the ducks, although Fisher had rejoined his two comrades, and all were walking off abreast,—Fisher only was shot.

While motive is not absolutely indispensable of proof in murder cases, still in every case of the thousands before the courts it appears that this is the first thing thought of and sought for, and being proven, is accorded much weight. Sane minds do not kill without motive except by accident. It is perfectly natural for the question to arise in the minds of jurors why should Emory Fisher be shot at first four times, and later five more shots be fired at him and his comrades.

The State undertook to shed light both on the identity of the slayer and his motive, by asserting and proving that appellant so strongly objected to hunting on his place without his permission as that he had threatened to shoot other duck hunters, and had shot at them when found on his place so engaged.

Is such proof relevant, and does it fairly lead the dispassionate mind toward a proper solution of the issues of identity and motive? There seems to the writer but one answer. One stray shot might go near a given man and be by accident, but a volley of four passing near the same man, would seem to support intent, and the second volley soon afterward at the same man, would much more strongly support the suggestion of intent and purpose. As reasoned by Mr. Wigmore in section 302 of volume 1 of his work on Evidence,—one unusual or abnormal element

might be present in one instance, but the oftener similar instances occur with like results, the less likelihood of their being the result of innocent chance, as, for instance, if A and B be hunting, and a bullet from B's gun whistles dangerously near A's head, this might be accepted as the result of bad aim or accidental discharge of B's gun, but if the same thing occur again the next time they are out, and on a third occasion A gets a bullet from B's gun in his body, the strong inference or probability, if not the certainty, is that B shot at A in each instance, and of course the more frequent the occurrence of the same supposedly abnormal or unusual thing followed by like or similar results, the less grows the likelihood of accident or inadvertence. The force of such reasoning holds good whether the subject of proof be motive of the accused or his identity. If A shot at a strange man whose only offense is that he is a trespasser on A's premises, and the next day and the next week he shoots again and again, and it be shown that he threatened to shoot others for the same offense, and then B be shot while trespassing on A's land, and the inquiry be,—who did the shooting, it would appear perfectly natural and reasonably true that proof of the prior acts and conduct of A afford a logical inference of his identity as the assailant, and such proof becomes peculiarly cogent and convincing when it is also in evidence that all the prior shootings at such trespassers, as well as at B, were done with a rifle, a weapon shown to be usually carried by A when out over his premises, and this is especially true when other facts show the shooting at B was done from a point near the residence of A, and where he was shown to be at the time, and that there is no other residence near.

Do the facts in the instant case support attempted application of this reasoning? Almost exactly. The boy shot was a trespasser on appellant's premises. The identity of his slayer as well as the motive in the slaying were issues in the case. On the day before Fisher was shot it was shown that appellant with a rifle shot at Mr. Dickerson, whose only offense was that he at the time was also a trespasser hunting ducks in the same field where Fisher was killed. On the same day Mr. Stout was shot at by this appellant using a rifle while hunting ducks in the same field without appellant's permission. Mr. Ivey,—whose only offense was that he was hunting ducks in said rice field without appellant's permission a week before Fisher was killer, —was squatting behind a shock of rice calling up some duck. Appellant holloed at him and his companion Fletcher and told them to get out. They walked back to where appellant was.

Appellant had a rifle. When they were twenty-five or thirty yards from him he asked them what they were doing in there. They replied that they were duck hunting. He asked how came them in there, and they hold him they had permission from Mr. Lundy. Appellant replied that this was his land, that it was not Lundy's land, and for them to tell that old s— of a b— that it was his land, and that Lundy did not have anything to do with it. They told him they thought they were doing right by getting Lundy's permission, and did not know the land was his. Appellant said he had them right where he wanted them; that he had a good mind to kill them and leave them lying there. He had the rifle pointed toward them. They got out. On a prior occasion Dickerson and a friend were duck hunting on appellant's land, and appellant came up, having his rifle in his hand, cursed them and ordered them to take their decoys and get across that bayou. Appellant said "I ought not to have come down here; I ought to have killed you from the hill side, but I will give you a chance." As witness and his companion were gathering up their decoys appellant rode some four or five hundred yards from them, and then turned and fired his rifle in their direction and burst a decoy in witness' hand. Witness said they took to the cane. Defense witness Henry testified without objection, on cross-examination by the State, that he had heard people talking about appellant shooting at persons when they got in his pasture; he had heard them say that appellant shot at them.

Certainly witnesses might describe tracks made by appellant on few or many cases prior to the one involved in a particular case, in order to enable the jury to identify the person who was claimed to have made similar tracks observed at the scene of the instant offense. Beyond question witnesses might tell of seeing the accused write on many former occasions when the object be to show him the author of a written instrument in a case on trial. Without doubt threats made by an accused on a former occasion directed at the injured party, or at some group or class which included such injured party, would be held admissible. Authorities are numerous to the effect that if a number of prior similar crimes had been committed in a peculiar and distinctive manner, or with any unusual weapon, the fact that the accused is known or observed to have committed a crime having the same peculiar and distinctive marks, or shown reasonably to have been committed with a similar peculiar weapon, such fact would be usable as evidence to identify him on trial as the guilty party in the other instances. If A be

charged with sending a threatening letter through the mail to B who was actively in opposition to A in some matter, witnesses might express their opinions that the letter in question is in A's handwriting, and clearly proof would be authorized that parties had seen A mail letters to other persons in which were words spelled similarly misspelled as were found in the alleged threatening letter. It would seem plain that if a group of men had given offense to B, and he meets some of the group and threatens them collectively, and later the house of one member of the group is bombed by some one unknown and the owner killed, proof might be made that persons had theretofore seen B placing similar bombs under the homes of others of the group, the object being to identify B on his trial for murder.

The real question here involved is that of relevance. Under all the authorities if proof of the extraneous matter or transaction is relevant to the issue either of motive and intent or identity, in the case before the court,—the criminality of such other matter or transaction passes out entirely. No authority is known to the writer holding otherwise,—certainly no Texas case so holding can be found.

There is no issue between the writer and the other members of this court over the admissibility of testimony as to the extraneous matters unless they are relevant upon either the issue of intent or motive, or the issue of identity of this appellant. In Weatherred v. State, 100 Texas Crim. Rep., 199, quoted from in the majority opinion, there was no question of the admissibility of testimony of other transactions. The only issue was the lack of sufficient testimony to show the guilt of the accused, for which lack the case was reversed.

Reviewing further authorities cited in the majority opinion, the case of Missouri v. State, 109 Texas Crim. Rep., 193, also quoted from in said majority opinion, is exact and full authority for my contention here. In that case we said: "Proof that appellant committed a like offense at another time is not legal evidence that he committed the offense for which he was being tried,—unless such other offense tended to prove intent, system, or identity when these are issues."

Again we said in the Missouri opinion, supra: "If it had been shown in this case that the former burglaries had been committed by appellant and that in the instant case the crime was committed in such manner or under such facts as tended to show that the party who committed the last burglary was identical with the one who committed the first *because of certain identifying facts common to both transactions,* the above

evidence would have been correctly admitted upon the issue of identity."

The above statement was eminently correct when the only issue was identity, as in said burglary case, and would fit here exactly on the issue of identity, but since the case at bar is a murder case, the statement above quoted of the law should be extended to hold admissible extraneous matters, with common identifying facts when the issue is the motive or intent of the accused. There is not a word in said opinion inimical to my views in this case and herein expressed.

Story v. State, 107 Texas Crim. Rep., 266, is also referred to and quoted from in the majority opinion. I wrote the quoted part of said opinion on rehearing. The entire opinion shows that Story was charged with robbery of a bank on June 9, 1925, and testimony was introduced on his trial for this offense of a search of his premises in August following, and that certain articles which had been taken from another bank in Sanger, Texas, in March, 1925, were found on appellant's premises, and we were discussing the error of the admission of testimony of the finding of such other property in appellant's possession. In our original opinion in that case we correctly held that proof of such possession "Does not show intent, system, identity or res gestae," and we reversed the case because we held this testimony was inadmissible, and on rehearing we reaffirmed the holding originally and wrote that part of the opinion quoted in the majority opinion herein. We were not discussing or intending to discuss testimony of extraneous offenses or transactions whose logical effect was to show intent, motive, system or identity. The rule holding such testimony admissible if it tends to establish any one of said issues, is too well settled in this State and too sound in reason to be attacked or unsettled by any expression found in any opinion written by any member of this court, and this is especially true when the entire context in any given opinion shows that there was no intent to attack the rule.

Texas Jurisprudence, Vol. 18, p. 65, is quoted in the majority opinion. Certainly this court has never held that simply because a case was on circumstantial evidence, extraneous transactions or offenses not tending to establish intent, system or identity could be introduced.

Bateman v. State, 81 Texas Crim. Rep., 73, is referred to in the majority opinion as illustrative of the true rule. In said opinion Judge Davidson says: "Where the identity of the party is not definite as connected with the offense on trial, ex-

traneous offenses may be introduced to connect and identify appellant with the case on trial."

The testimony in said case as to an extraneous transaction had much less in it tending to identify the accused as the perpetrator of the crime charged than appears in the case before us, but the judgment in said case was affirmed. For us to say that we held the evidence of the extraneous offense "a link in a chain of circumstantial evidence" would appear sound,—for every circumstance of evidential character admitted in support of any phase of the case would to some extent be a link in the chain of evidence.

I am unable to see anything in the quotation from Boyd and Standley v. United States, quoted from in the majority opinion, —that illuminates any point in the case at bar. No issue of intent or identity was there involved, and none such are discussed. Certainly I am not basing any contention here that the testimony showing plainly that this appellant had such rooted animosity toward all persons found hunting on his place as to lead him in every instance proven to either shoot at or threaten to shoot such hunters, should be held admissible on the idea that it proved him a killer in general. Nothing is further from my position, and what appears and is said in the Boyd-Standley case, supra, seems to be wholly aside from the issue in this case.

This appellant was not a killer generally. His animosity was not toward all men but only toward those who without his permission hunted on his place. No testimony was offered that he shot at people generally, but the testimony was confined to the support of the proposition contended for, namely, that Emory Fisher was shot at by some one who had no personal animosity against him, but whose feeling was engendered by Fisher's acts, in hunting ducks on appellant's premises without permission, and that the State in its effort to find out such slayer had the right under all the authorities to show if it could other shootings by this appellant at other duck hunters on his land, also other threats directed at other duck hunters hunting on his place without permission. To me the plain and legitimate purpose of such testimony was to supplement the testimony already pointing to appellant, and to show it more likely that this man who had stepped aside in this particular regard, upon every occasion theretofore afforded him within the knowledge of the State, had fired the volley at Fisher that killed him,—for no other reason save that he was a duck hunter without permission on appellant's premises, and that he was

not killed by some accidental shot from the user of a high powered rifle in the hands of some other person somewhere within range; also that in so killing Fisher appellant was actuated by sufficient evil intent to shoot at and near him nine times in close succession with a rifle, and thus justify the conclusion that the shooting was upon malice.

In Wyatt v. State, 55 Texas Crim. Rep., 73, also referred to in the majority opinion, it is expressly held, both in the main opinion and the dissent, that evidence which goes to show intent or identity of the accused, even though it proves other and different crimes, is always admissible. I join with Judge Ramsey in his statement in his dissent that evidence of other offenses is not admissible merely because there are other offenses. It was said in our original opinion in this case, and is here repeated, that unless proof of these extraneous acts and transactions of this appellant point to him and make probable his identity as the one who shot Fisher, or illuminate his motive in the shooting, the evidence should not have been admitted.

Therein lies the difference between the case at bar and that of Musgrave v. State, 28 Texas App., 57, and Lancaster v. State, 82 Texas App., 473, and many others cited by Mr. Branch in section 166 of his Annotated P. C., wherein he lays down the well settled rule above quoted, viz: that proof of extraneous crimes which do not go to show intent, identity or system, or is not part of the res gestae,—is not admissible.

The thing in the majority opinion with which the writer is totally at variance is the assertion that the conduct of appellant toward Dickerson, Stout, Ivey et al., constitutes no link in a chain of evidence such as is contemplated by the authorities, and that it simply furnishes a predicate for the conclusion that appellant is a bad man generally. To me this statement is astounding.

Not an authority on facts at all similar is or can be set out or discussed as furnishing basis for such statement. It is without foundation in law, reason or facts.

There is nothing in the State's case here tending to show that this appellant was a bad man generally, or that he assaulted, shot at or threatened people in general just because he was a bad man, or just because he could, or just because they were people. There is not a suggestion in this record that appellant assaulted, shot at or threatened anybody except those who,—like Fisher,—were hunting without permission on his land. The proof shows that he had leased part of his place as a hunting preserve. No one claimed that he had ever assaulted,

shot at or threatened members of this club who hunted thereon, though on his land. No witness testified or claimed that appellant shot at or assaulted people in his pasture who were not hunting. No one claimed that he quarreled with, fought or assaulted people on roads or in town, or under any other situation save when hunting on his place without permission. This being true, and it also being true that as far as the State could find out or show he always shot at, threatened or drove out with his rifle every man he ever saw hunting on his place without permission, it would be logical, reasonable and in consonance with every authority known to the writer, that in an occurrence such as is here where a boy was duck hunting without permission on appellant's land be fired upon from the direction of appellant's house nine times with a rifle, and killed by one of the shots, and the issue plainly be made as to who killed him and why,—that the State should be allowed to prove the attitude and identity of the slayer by the acts and words of this appellant toward others similarly situated and acting as was deceased when shot.

Multiplication of citations amounts to nothing unless they be pertinent. It is correct to say,—as said in the majority opinion,—that simply because one crime is committed in the same way as another, this does not show system, but the cited cases of Long v. State, 39 Texas Crim. Rep., 546; Smith v. State, 52 Texas Crim. Rep., 80, and Missouri v. State, 109 Texas Crim. Rep., 193, do not justify any inference that testimony should not have been received in said cases, which showed the offenses to have been committed in the same way,—if the State had gone further, and in order to prove identity, had proved in the Long case that a peculiar tool had been used in breaking into the wheat bins in the aliunde transactions, whose impress was found upon the building burglarized,—in the case on trial,— and if the State had further shown that the wheel tracks of the wagons used in hauling the wheat in the extraneous transactions, had identical peculiarities with those found in the road made in the case on trial, and that partially consumed cigarettes of the same brand had been found at the scene of the other burglaries as were found at the scene of the case on trial; and that one of the men engaged in the extraneous burglaries walked with a limp, as did one of those engaged in the instant burglary. In other words, what we said in the Long case was true when applied to the facts of the Long case, but was never intended to reach out and hold improper other evidence applicable in other cases upon the issues involved in such other cases. What

we have just said has application to the Smith case, supra. An accomplice was allowed to testify that he and Smith had agreed to burn other houses than the one involved in the case on trial, and that in pursuance of said agreement other houses had been burned, but there was not a single identifying circumstance or perculiarity shown in any of the other transactions such as would make it admissible to show identity or motive, which fact entirely differentiates it from the case before us. So, also, as to the Missouri case, supra.

Likewise it is true that the mere fact that two or more crimes were committed in the same way, or in pursuance of the same conspiracy, as said in the majority opinion, does not show system,—but this affords no sort of reason for saying that it would not be provable against A, charged with killing a Greek, —when the purpose of the testimony be to identify A as the killer, or to show his malice in so doing, in a case of circumstantial evidence,—that A had agreed with one or more other people to kill all Greeks, and that A had threatened and assaulted and shot at every Greek with whom he came in contact, and had used the same kind of weapon with which the killing was done in the instant case.

Mayes v. State, 118 Texas Crim. Rep., 612, is also cited in the majority opinion, and a quotation therefrom appears. There is no similarity in that case and this. Mayes bought horses and gave a check on a bank in payment, in which bank he had no money. On his trial for this offense the State was allowed to prove that the day before this particular transaction Mayes bought other horses, giving for them a check on the same bank. His defense was that he gave the check in question in good faith and upon the promise of the holders of said checks to hold them until he could get home where he expected to have said checks cared for. In disposing of the alleged error in admitting proof of the giving of the second check we quoted from the Long case, supra, a statement absolutely sound as applied to the facts in the Long case, but absolutely without application in a case on facts like the one here. To even a casual reasoner it must be evident that the Mayes case is wholly different on facts, and necessarily on legal principles governing, from the one at bar. There was no question of identity in that case. It was not a case of circumstantial evidence, and the only claim of the State regarding the admissibility of testimony as to the second check was that it showed system. After demonstrating the error of this claim of the State, we affirmed the case, holding that evidence of the second transaction was admissible to

rebut appellant's claim of good faith in the giving of said check, and we further said: "When the purpose of the State is to rebut some claim of good faith, or lack of evil intent in the particular transaction involved, the State may prove appellant's guilty connection with similar transactions contemporaneously or nearly so with the one involved. When the question of the identity of the accused as the guilty party is combated and in doubt, the solution of such question may be aided by proof, in proper cases, or the identity of the accused as engaged in similar transactions at or about the time inquired about."

The writer of the majority opinion in this case undertakes to say that there is one feature of the extraneous transactions proven by the State, and the shooting of Fisher,—which is dissimilar. I have not found any case of the hundreds in our books where evidence of extraneous offenses and transactions is held admissible as proving intent, identity or system,—in which this court held that the evidence should have been rejected because there was one or more features of dissimilarity. It may be soundly said that if such rule should now be made or attempted, it would result in the rejection of all such testimony, for no two transactions could be found exhibiting exactly identical features throughout. The features of similarity which were material were the weapon used, the location,—as on the premises of appellant,—and the fact that Fisher was shot solely because he was hunting ducks on appellant's land without permission, all these features appearing in the proven extraneous offenses. That these features differentiated, individualized and set apart all these transactions as being in the same class, and all the parties assaulted, threatened and shot at as being in the same class, appears to the writer beyond question. Fisher was on appellant's land with his companions crossing a pasture. They were not fired on until Fisher shot at a duck, thus identifying his character and purpose in the mind of the man who shot at him from a distance of some eight hundred to a thousand yards, and who in all human probability was attracted from his house to his big gate by the shot fired by Charlton some ten minutes before the instant shooting,—but who at that distance could not know that Fisher was hunting ducks until he fired at them, which shot was followed immediately by rifle shots from about said big gate.

It is stated by the writer of the majority opinion that he originally agreed to an affirmance of this case upon a belief that the principle of the admissibility of threats against a class, —which included the deceased,—had application; but he has

now reached a different conclusion. I am sorry. The original opinion was written after much reflection and investigation and a careful study of the facts. Respect for the views of my associates has caused me to look carefully into the law, and more closely into the facts. I have set out above some discussion of the legal questions, and they seem so well settled when there are, as in this case, issues of identity and motive and intent, that there seems scant room for difference as to the law. As to the facts, I submit my analysis of same and of the application thereto of the principles of the law asserted, with entire confidence in the soundness of both.

May I add that if threats, or one threat,—had been made by this appellant directed toward deceased personally, its admissibility would not be disputed. If appellant had assaulted or shot at deceased one time before the instant shooting, this would be provable without question. The soundness of the rule that threats, directed at a class which included the deceased, are provable upon his trial for killing one in that class, to show identity or motive,—seems too well established to be even argued against. I confess that my mind refuses to grasp a difference in principle between proof of repeated assaults upon others of a class, which included deceased, and that of repeated threats against persons in such class,—and this is especially true when clearly the sole reason for the assaults upon members in such class was the fact of their being in same.

I can not make clearer than I have that the State offered no testimony of threats generally on the part of appellant, and that the State had no purpose to show appellant a bad man generally. Every threat, every assault, every shot at any person, proven by the State,—was one at persons who were hunting on appellant's premises without permission, and at no others. That this same thing of hunting on this man's place without his permission caused this appellant to send this boy to his grave by a rifle shot,—can not be doubted under this record for a moment. To hold otherwise challenges credulity to the breaking point. I can not agree to this reversal and believe that the testimony was admissible, and respectfully record my dissent.