### MIGUEL FLORES v. THE STATE.

No. 23854. Delivered February 4, 1948.
Rehearing Denied March 17, 1948.

*Alaniz & Norris,* of Alice, for appellant.

*Frank W. Martin,* District Attorney, of Goliad, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

HAWKINS, Presiding Judge.

Conviction is for the murder of Paul Gibson, punishment assessed at death.

Deceased was known, and frequently referred to in the testimony as Blue Gibson. About five o'clock p. m. on February 6, 1947, appellant went to the Highway Cafe which was operated by Mr. W. A. Walker, assisted by his wife, Mrs. Beulah Walker. Employees of the cafe present at the time were Geneva Garcia (sometimes called Beva) and her two sisters, Josephine Cuellar and Mamie Barrentos. Verna Mae Young also worked at the cafe.

It may be stated here that the evidence shows that divorce proceedings were pending between Beva Garcia and her husband, and that appellant had been going with her without the knowledge of her family. Appellant seems to have been infatuated with her.

Geneva (Beva) Garcia testified that when appellant came to the cafe about five o'clock in the afternon she had a conversation with him in the presence of her sister Josephine in the yard; that she told him she was not allowed to talk to anybody up there, and he said she had to talk to him or he would kill her; he said he wanted to take her home after she finished work, but she told him no, that Mr. or Mrs. Walker would take her home, and he said he would kill her, that it would be her last night because she would not go home with him; that while they were talking Mr. Walker stepped outside and called her in, telling her she had some work to do.

Josephine testified upon the point substantially as did Geneva, and in addition, said that when Mr. and Mrs. Walker told Geneva to go in the kitchen and cook, appellant said to her (Josephine) that if she did not get her mother to let Geneva go with him he would kill Josephine and her husband, and come to the cafe and "finish everybody in the cafe." Josephine further testified that when Mr. and Mrs. Walker came into the yard where appellant was talking to Geneva and her (Josephine), Mrs. Walker told appellant they did not allow anyone to talk to the girls, that they had to work, and that appellant then said "he was going around the front and do something. I did not know what he *means* about who he was going to hurt or something there." At this point a kinsman of appellant took him away in a car. He seemed to be very angry and did not want to go, and Mrs. Walker called her husband, and appellant then left.

About seven-thirty o'clock that evening a shot was heard by a witness, and the body of Paul (Blue) Gibson was found in the road. He had been shot with a shotgun. The wound was in the back under the point of the left shoulder blade, and was about two inches in diameter. The place where the body was found was about three blocks from the cafe.

After appellant left the cafe Mrs. Walker went after some ice. As she was returning to the cafe she passed appellant who was "trotting along," and had a gun. She also saw Blue

Gibson. At the time she saw them appellant and Blue were about two blocks apart.

The confession of appellant was introduced by the State without objection. Omitting formal parts, it is as follows: "* * * last night or yesterday, February 6th, 1947, about 5 o'clock P. M. in the evening I went to the Highway Cafe in Goliad, Texas, which is near the Gulf Filling Station, to see and talk to Beva Garcia who was working at the cafe. I saw her and she was busy. I drank a cup of coffee at the cafe. The man that runs the cafe, Mr. Walker, told me to leave the cafe, and that made me so mad so I left at once and went to where I have been living in east Goliad about a mile from town near the railroad tracks to get my gun. I was living with my sister, Chana Sosa. I went in my room and got my gun which is a sixteen gauge shotgun that I bought from Sammy Garza about eight months ago. I got five loaded cartridges No. 6 shot at the same time and put one cartridge in my gun and the other four cartridges in my pocket. The five cartridges were all that I had. I then started walking back up town and came down the street where the beer joint is on the corner across from the cotton platform. I was plenty mad at that time and was going back to the cafe to shoot Mr. Walker because he had run me off from the cafe. I turned north towards the highway on the road which comes from the park and met Paul (Blue) Gibson, a negro who I had known for a long time, in the road. Blue tried to take my gun and he was laughing when he did it, and I kept him from taking the gun; then Blue Gibson started to running away from me and when he was about twenty feet from me I shot him in the back with shotgun. I shot Blue because he tried to take my gun. He did not say anything to me and I did not say anything to him before I shot him. Blue fell over after I shot him and I reloaded my gun and went on towards the cafe. I went in back of the buildings on the highway and did not go down any road. I went to the back of the cafe and still had my shotgun with me and I went to the cafe to shoot Mr. Walker. When I got to the door of the cafe Beva saw me and hid behind the ice box; the girl was sitting down when she first saw me. Then Mr. Walker shot at me with a pistol and I ran around the cafe building. Walker came out and I shot at him and then ran to where my sister Petra Palamares lives. I saw her and left my shotgun at her house but did not tell her what I had done. Then I left and went to my brother's house where I was arrested. It was between six and seven o'clock when I shot Blue Gibson. The shotgun which is now shown me which is a Stevens gun and which has the initials 'WB' on the bottom of

the stock and the letters 'WFB' on the side of the stock is the gun which I shot Blue Gibson with and shot at Walker with. I had been drinking some beer before the shooting but I was not drunk at that time and I knew what I was doing when I shot Blue Gibson. I was not afraid of Blue Gibson and shot him because I was mad, and he wanted to take my gun. I had never had any trouble with Blue Gibson. I had been going with Beva Garcia for some time before the trouble last night. I dropped a loaded cartridge at the cafe and left two of the loaded cartridges at my brother's house when I got there after the shooting."

The evidence shows appellant went hurriedly from the scene of the shooting to the cafe, going in the back way. He reached the cafe within ten minutes after he had killed Blue.

The detailing by various witnesses of what occurred when appellant returned to the cafe is made the subject of bills of exception Nos. 1, 2, 3, 4, 5, 7 and 8. The substance of this evidence is as follows: Mrs. Walker testified that after she had seen appellant going in a trot towards the cafe with a gun she returned to the cafe and hooked the back screen door leading from the back porch to the kitchen, and knew it was still so hooked when appellant returned to the cafe. Within a few minutes after she got back she heard a girl scream, and saw the gun stuck in the back door. Witness told her husband appellant was there, and Mr. Walker fired a shot at him with a pistol, and appellant fell off the steps. Mrs. Walker then heard one of the waitresses, Verna Mae Young, scream and fall to the floor A shot was fired and some of the shot struck Eugene Lockhart in the face. This shot entered at the window.

Mamie Barrentos testified substantially as follows: She saw appellant when he went into the porch behind the kitchen; he had his gun pointing across the screen door and was pointing it at her sister, Beva Garcia, who was in the kitchen. Witness ran to the front of the cafe and heard the shooting which resulted in Lockhart being struck in the face. He was standing by the "Victrola" when he was shot.

Mr. Walker testified that he saw appellant when he came back to the cafe, about dark with a gun. Appellant was at the back door when witness first saw him, and was "fixing to shoot in the back door, had the gun up in front of the door." Witness fired at appellant who ran around the house. Witness started through the kitchen and appellant fired into the window. Wit-

ness fired at appellant again and he ran around the corner of the building, and as witness went around the corner appellant fired at him again, just as witness stepped into a hole and fell. Appellant then ran and witness fired at him again as he ran away. When witness first learned that appellant was at the back door Beva was trying to hide behind the icebox.

Verna Mae Young, a waitress at the cafe, testified in substance: That when appellant came back to the cafe she heard shooting; that Mr. Walker fired the first shot and then some shots came from the outside, one shot coming through the screen over an open window. This shot came close to witness who "ducked" as the shot was fired. This shot struck Eugene Lockhart in the face. Witness said if she had not "hit the floor" this shot would have likely struck her.

Eugene Lockhart, who seemed to be present at the cafe as a customer, and without connection with any of the parties, testified in substance: That he was standing near the "juke" box when he was struck in the face by shot, which knocked him down. One shot hit him in the nose, another through the lip and one over the eye. The main charge missed witness and struck the wall over the "juke" box. Witness did not know where the shot came from.

Appellant objected to testimony as to what happened at the cafe after Blue had been killed, on the ground that what occurred at the cafe at such time, (a) had no connection whatever with the offense charged against appellant and for which he was on trial, and that the incidents at the cafe were not connected in any manner with the killing of deceased; (b) that such incidents at the cafe were not res gestae of the killing of deceased; (c) that the incidents at the cafe upon appellant's return thereto were not offered in rebuttal to testimony placed in evidence by appellant. Most of the bills of exception complaining of the evidence as to what occurred at the cafe on appellant's second appearance there are qualified by the court as follows

"* * * Prior to the introduction of this testimony the State had introduced in evidence the voluntary statement of the defendant (S. F. pp. 14 to 16, inclusive) and the testimony of the witness Geneva Garcia (S. F. pp. 22 to 26, inclusive) and Josephine Cuellar (S. F. pp. 27 to 30, inclusive). In the opinion of the Trial Court said testimony established the fact that all of the actions of the defendant from the time he originally went to the Highway Cafe in the neighborhood of 5 o'clock P. M. on the afternoon of the shooting and prior to the shooting of the

deceased until the time that he left said Highway Cafe after the shooting of the deceased and after the shooting and other transactions which occurred at said Highway Cafe on his last visit thereto were admissible as part of the *res gestae* of the shooting of deceased and as evidence showing the condition of the defendant's mind, the presence of malice, his intent, and other facts pertinent to this case. The state offered the testimony objected to in this bill of exception on the ground that said testimony showed that these proceedings were one complete criminal transaction on the part of the defendant, and that the testimony offered showed intent, motive, condition of defendant's mind, and that all of these transactions were a part of one indivisible transaction, and was all a part of the *res gestae* of the offense for which the defendant was on trial. * * *"

In regard to the objection that the evidence objected to was not in rebuttal we note that upon the trial appellant testified that while he was talking to Geneva Garcia Mr. Walker came out like he was mad, and that appellant understood Walker wanted to kill appellant; that he went back to the cafe with the intention of talking to Mr. Walker to "see how come him to say he wanted to kill me;" that he did not intend to kill Mr. Walker or anyone else; that he armed himself "just to come to see Mr. Walker, see why he threatened me;" that when he met Blue and they were scuffling "I got the idea he wanted to kill me, and I thought somebody else had sent him out there to kill me. I was fearing somebody had sent him. I was fearing Mr. Walker had sent him down there to kill me." Appellant's further testimony was to the effect that in the transaction at the cafe when he got back there he was acting on the defensive throughout. If it be conceded that in view of appellant's testimony, some or all of the evidence as to the incidents at the cafe upon appellant's second appearance might more properly have been offered by the State in rebuttal, the opinions of this court in Gregory v. State, 92 Tex. Cr. R. 574, 244 S. W. 615; Shannon v. State, 123 Tex. Cr. R. 521, 59 S. W. (2d) 142, and cases therein cited, settle the question against appellant that the State's premature introduction of testimony rendered relevant by accused's subsequent conduct of the case was not reversible error.

Regarding appellant's objection to evidence of the subsequent transactions at the cafe on the ground that they were not res gestae of the killing of deceased and had no connection therewith, we are in complete agreement with appellant's general proposition that evidence should be limited as far as practicable to the very case on trial, and that testimony should be excluded

of extraneous offenses, contests, controversies and difficulties. This rule has been given application many times by this court. It was given serious consideration, and application in Lawrence v. State, 128 Tex. App. 417, 82 S. W. (2d) 647 and many cases reviewed because of some difference of opinion by the members of the court. However, after a most careful consideration of the facts here present we are of the opinion that the instant case furnishes an exception to the rule contended for by appellant, which exception is as well established as the rule itself.

In Wharton's Crim. Evidence, (10th Ed.), Section 30 states: "Proof of collateral offenses not admissible.* * *"

It is stated in Section 31: "* * * Certain exceptions exist, however, to the rule just stated. * * *"

Among the exceptions are:

"(1) * * * Relevancy as part of res gestae. * * *
"(4) Relevancy to prove intent.
"(5) Relevancy to show motive. * * *
"(7) Relevancy to prove malice.
"(8) Relevancy to rebut special defenses. * * *"

See also Underhill on Evidence, (4th Ed.), Section 182, stating another exception, as follows: "Connected or intermingled crimes forming parts of one whole. - - If several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them can not be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme.* * *"

These exceptions to the general rule have been given frequent application, and it may be said, now find a place in the statutory law of our State by the enactment by the 40th Legislature, p. 412 Ch. 274, of Section 2 thereof, which is found in Vernon's Tex. C. C. P., Vol. 2, as Article 1257a. We quote, italicizing the part thought particularly applicable. "In all prosecution for felonious homicide the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, *together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the homicide, which may be con-*

*sidered by the jury in determining the punishment to be assessed. * * *"*

The foregoing enactment did not change the rules of evidence, but was a statutory recognition of an evidentiary rule which had been given frequent application.

In this case every issue and element of the offense of murder with malice was put in issue under appellant's plea of not guilty, and the State was entitled to prove what happened prior to the actual killing of deceased, and subsequent thereto, in order to show malice, intent, condition of appellant's mind, and motive, in the development of the res gestae of the main offense charged. During the trial appellant testified that he acted in self-defense in killing deceased. The State controverted this by appellant's own confession, the location of the wound in deceased's back, and that no marks of a scuffle were found on the bodies of deceased or appellant. It was the State's theory, supported by the evidence, that appellant became enraged at Geneva Garcia for her refusal to permit him to take her home, and at Mr. Walker for calling Geneva into the cafe when appellant was talking to her; that appellant went home, secured a shotgun and was hurriedly returning to the cafe with intent to carry into execution his previously formed design to kill the girl, Walker, and any others who might endeavor to interfere with him; that he was highly enraged and ready to kill anyone who might undertake to thwart his plans; that deceased, who was not shown to have any connection with the parties at the cafe, or any knowledge of the prior occurrence there, in a good-humored way undertook to take appellant's gun, and not to be stopped from carrying out his original design against the parties at the cafe, he killed deceased and then hurried on to the cafe. The acts and conduct of appellant there unquestionably bore upon his claim that he killed Gibson in self-defense; it cleared up the question of motive for the killing, and showed the condition of appellant's mind when the killing occurred. The shooting of Blue Gibson and the transactions at the cafe appear to be so closely connected in time and circumstances as to be a part of an indivisible, intermingled whole, and proof of one without the other would not be properly understandable.

We conclude that the action of the trial court in receiving the evidence of the happenings at the cafe subsequent to the killing was not erroneous.

Bills of exception Nos. 6 and 10, as explained and qualified, are not thought to present error.

Bill of exception No. 9 reflects that in his closing argument the district attorney made the statement, in substance, that he could not blame appellant's attorneys for putting up the defense they had, and: "We all know that they have been paid a large fee, and have their money in their pockets." This argument was objected to, the grounds of objection not appearing in the bill. The objection was sustained and the jury was instructed to disregard the argument. Notwithstanding this, appellant insists that reversible error is shown. The court qualified the bill to show that appellant's attorneys made some reference in their arguments to State's attorneys having prosecuted the case because they were paid officials of the State, and that it was in attempting to reply to such argument that the district attorney made the statement objected to. The trial court then states: "* * * Even though such remarks may have been proper, having been called for by prior argument of defense attorneys, the Trial Court, through an abundance of caution, sustained the objection of the defendant at the time said remarks were made and instructed the jury not to consider the same. * * *"

Under the circumstances, if any error was committed, it seems to have been against the State.

The case has had our most careful consideration.

The facts warrant the supreme penalty assessed.

The judgment is affirmed.

### ON MOTION FOR REHEARING.

KRUEGER, Judge.

In his motion for a rehearing appellant claims that we failed to give his bills of exception that careful and serious consideration which the nature and result of the trial required. In order to disabuse his mind of such an impression, we desire to here state that in all cases and especially where the extreme penalty is imposed this court most carefully examines the record and every question raised by the condemned party. However, we must follow the rules of procedure which have been established and adhered to for nearly three-quarters of a century.

We have again reviewed the record and his Bills of Exception Nos. 6 and 8 which he contends reflect error but we are unable to agree with his contention. Bill of Exception No. 6 shows that the district attorney on cross examination of appellant in-

quired of him if he was not then under indictment for an assault with intent to murder Lockhart to which appellant objected. The objection was by the court sustained and the jury was instructed not to consider the same. The fact that he shot Lockhart a few minutes after he had killed Paul Gibson was already before the jury and the mere fact that he was indicted for the offense could hardly have intensified the damaging effect thereof. The two offenses were so closely related, connected and interlocked that one cannot well be separated from the other.

Bill of Exception No. 8 shows that while Mr. Lockhart was testifying he pointed out the places on his body where the No. 6 shot had penetrated the same. Appellant contends that this had the effect of inflaming the minds of the jury to his prejudice, and cites us to the cases of Newman v. State, 213 S. W. 651; McKee v. State, 102 S. W. (2d) 1058; and Kazee v. State, 116 S. W. (2d) 731. It will be noted that in the Newman case the wounds were so gruesome in appearance as were calculated to arouse sympathy of the jury for the injured person and prejudice against the accused, but in the instant case, there is no showing that the wounds made by the No. 6 shot had an ugly and gruesome appearance of such a nature as was calculated to inflame the minds of the jury. Under the facts as disclosed here, we see no error reflected by the bill.

The motion for rehearing is overruled

Opinion approved by the Court.